**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| CREATIVE PHOTOGRAPHERS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION FILE NO. |
| | ) |
| JULIE TORRES ART, LLC and JULIE | ) 1:22-cv-00655-JPB |
| TORRES, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**DEFENDANTS JULIE TORRES ART, LLC AND JULIE TORRES'
BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFF
CREATIVE PHOTOGRAPHERS, INC.'S FIRST AMENDED COMPLAINT**

Defendants Julie Torres Art, LLC ("Torres Art") and Julie Torres ("Torres"), (together, "Ms. Torres"), respectfully move the court to dismiss all counts of the First Amended Complaint ("Am. Compl.") (Doc. 29) filed by Plaintiff Creative Photographers, Inc. ("CPi").

## I.   INTRODUCTION

This case purports to lodge a grievance against Ms. Torres – a renowned local visual artist featured in The Metropolitan Museum of Art – for alleged copyright infringement of a photograph of Supreme Court Justice Ruth Bader Ginsburg. Even given the benefit of Ms. Torres' motion to dismiss arguments in two separate forums

for CPi to consider over the course of more than six weeks, the newly-filed Amended Complaint still fails. In fact, CPi's amendment and exhibits further confirm, beyond doubt, that it does not have standing to bring the claims that it asserts in this case. CPi has now attached and incorporated by reference the agreement that allegedly establishes its standing (Dkt. 29-6). That agreement lays plain that CPi is not an owner or a licensee at all, but a mere agent tasked with securing licensees, sales, and other deals for the copyright owner, photographer Ruvén Afanador ("Afanador").

Second, to the extent the Court finds any basis for standing, the Court should dismiss the Complaint under Fed. R. Civ. P. 12(b)(6) because Ms. Torres' works qualify as a protected "fair use" of the asserted photograph as a matter of law. Ms. Torres' work is an unmistakable transformative commentary on the photograph, juxtaposing the wild, rebellious, scattered character of Ms. Torres' creative expression with the "scholarly" reputation of Justice Ginsburg. The Court need only compare the works at issue to conclude no set of facts will support copyright infringement here. CPi's new claim for violations related to copyright management information is also a recitation of pure legal standard supported by no facts.

## II.   ALLEGED FACTS AND PROCEDURAL BACKGROUND

CPi alleges it is a photography agency representing photographer Afanador for editorial and commercial licensing. Am. Compl. ¶ 3. CPi contends Afanador took

a black-and-white portrait photograph of Supreme Court Justice Ruth Bader Ginsburg (the "Asserted Work") and describes key distinctive features of the portrait as the "silhouette of Justice Ginsburg, signature collar of her robe, fold of her hands, and most importantly her scholarly gaze into the camera." *Id.* ¶ 14. Afanador is not a party to this case, and CPi alleges it holds, either as owner or exclusive licensee, some rights in the Asserted Work. *See*, *e.g.*, *id.* ¶¶ 13, 16, 25, 44.

CPi attaches as Exhibit 3a a copy of an agreement (the "Agency Agreement") between CPi and Afanador that it claims governs the relationship between CPi and Afanador with respect to the Asserted Work. *Id.* ¶ 25. The Agency Agreement does not license any work by Afanador to CPi, including the Asserted Work. Rather, it expressly identifies that Afanador is retaining CPi as his "exclusive agent" for a narrow task: "to sell, syndicate, license, market, or otherwise distribute" Afanador's original portrait photographs. Doc. 29-6 at Agreement p. 1. Not all such photographs are covered, however, as the Agency Agreement is further limited to images actually submitted to CPi by Afanador and accepted by CPi ("Accepted Images"). *Id.*

By the terms of the Agency Agreement, Afanador retains significant rights in the Accepted Images. Notably, the Agency Agreement does not transfer ownership of any work by Afanador to CPi, including the Asserted Work. There is no language describing a transfer of ownership, and the Agency Agreement specifically ***requires***

3

the opposite – that Afanador must remain the "sole owner of the copyright" in his Accepted Images for the duration of the agreement term. *Id.*

The Agency Agreement only purports to prohibit Afanador from offering the Accepted Images "for sale or syndication" to another during the term. *Id.* It does not restrict Afanador from licensing, reproducing, distributing, or displaying his images, or from authorizing derivative works of his images, or grant CPi the right to bring legal claims. *See generally* Doc. 29-6. In fact, the Agency Agreement makes no mention of derivative works or the right to pursue legal claims at all. Afanador can further terminate the Agency Agreement without cause and trigger a reversion of any rights discussed in the agreement to himself. *Id.* at Agreement p. 1. And, should CPi ever wish to transfer any of its rights under the Agency Agreement to another, CPi would be required to get Afanador's written consent. *Id.* at Agreement p. 2.

Ms. Torres is a mixed-media artist residing in the state of Georgia against whom CPi alleges has brought a copyright claim alleging infringement of the Asserted Work. Am. Compl. ¶¶ 6, 15. Ms. Torres' works of art are of such creative renown that they have been displayed in The Metropolitan Museum of Art. *Id*. ¶ 47. CPi claims vaguely the Asserted Work and "all the essential and distinctive elements" thereof are included in certain of Ms. Torres' "screenprints, mixed media works, and limited edition prints" (hereafter, the "Accused Works"). *Id*. ¶¶ 14, 46.

A close observation reveals the Accused Works are intricate weavings of strips of paper with text of quotes from Justice Ginsburg. *See* Doc 29-2 (Am. Compl. Ex. 2a).

On November 19, 2021, CPi filed a complaint against Ms. Torres in the Southern District of New York alleging that Ms. Torres violated CPi's copyrights by copying and distributing their copyrighted work of authorship. Doc. 1. On February 4, 2022, Ms. Torres requested leave to file a motion to dismiss or transfer the action to the Northern District of Georgia under 28 U.S.C. § 1404. Doc. 14. Subsequently, the Court granted the motion to transfer the action. Doc. 18. Ms. Torres moved to dismiss the original Complaint on March 2, 2022. Doc. 22. Rather than opposing the motion to dismiss in substance, CPi filed an Amended Complaint with minimal substantive revisions, several newly named defendants, and an additional claim under the Digital Millennium Copyright Act ("DMCA"). Doc. 29.

Ms. Torres now moves this Court to dismiss the case on the same grounds previously argued: (1) for lack of standing because CPi is not a copyright owner or exclusive licensee of the Asserted Work, and (2) for failure to state a claim because Ms. Torres' work qualifies as a transformative fair use of the Asserted Work.

## III.   LEGAL STANDARDS

### a.  Motion to Dismiss Under Rule 12(b)(1) for Lack of Standing

"The most notable—and most fundamental—limits on the federal 'judicial

Power' are specified in Article III of the Constitution, which grants federal courts jurisdiction only over enumerated categories of 'Cases' and 'Controversies.' This case-or-controversy requirement comprises three familiar 'strands': (1) standing, (2) ripeness, and (3) mootness." *Gardner v. Mutz*, 962 F.3d 1329, 1336 (11th Cir. 2020) (citations omitted). If a party to a lawsuit does not have standing to bring claims, the Court lacks subject matter jurisdiction over the claims. *See Nat'l Ass'n of State Utility Consumer Advoc. v. F.C.C.*, 457 F.3d 1238, 1250 (11th Cir. 2006). "Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." *Stalley ex rel. U.S. v. Orlando Regional Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (quotation omitted).

Standing can be raised by either party, or "by a court on its own initiative, at any stage in the litigation." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *see also Gardner*, 962 F.3d at 1337. The Court is also required to satisfy itself of a party's standing before proceeding to consider the merits of the claims. *Gardner*, 962 F.3d at 1336. Here, CPi has the burden to establish standing in this copyright case by "clearly and specifically set[ting] forth facts sufficient to satisfy Article III standing requirements." *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1362 (S.D. Fla. 2016). If CPi is unable to meet its burden of establishing legal or beneficial owner

ship of a copyright sufficient to plausibly allege standing, the Court must dismiss the action. *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1297 (11th Cir. 2011).

Under the Copyright Act, "only the legal or beneficial owner of an 'exclusive right' has standing to bring a copyright infringement action." *Pro. LED Lighting, Ltd. v. AAdyn Tech., LLC*, 88 F. Supp. 3d 1356, 1369 (S.D. Fla. 2015) (dismissing with prejudice for lack of standing); *Saregama*, 635 F.3d at 1290–91 (non-exclusive copyright holder may not sue others for infringement). Assignment of an exclusive right is effective where "language used included that [the] copyright owner 'sells, transfers, and assigns' all rights to the work," and ineffective if it does not "contain an actual assignment provision." *Pro. LED*, 88 F. Supp. 3d at 1370.

To bring and prevail on a copyright infringement claim, CPi must hold an exclusive right specifically articulated by the Copyright Act and demonstrate a violation that specific right. *Original Appalachian Artworks, Inc. v. Schlaifer Nance & Co.*, 679 F. Supp. 1564, 1571 (N.D. Ga. 1987). It is Section 106 of the Copyright Act that sets out the exhaustive list of "exclusive rights" that a copyright owner can do or authorize.[1] CPi must plead and prove infringement of the precise Section 106

---

[1] Namely, (1) to reproduce the copyrighted work, (2) to prepare derivative works based on the copyrighted work, (3) to distribute copies of the copyrighted work, (4) to perform audiovisual copyrighted works publicly, (5) to display a copyrighted work publicly, and (6) to perform copyrighted sound recordings publicly by digital audio transmission. 17 U.S.C. § 106.

right it holds, not other rights or interests. *See, e.g.*, *Fahmy v. Jay-Z*, 908 F.3d 383,

394 (9th Cir. 2018) (finding plaintiff did not hold the specific exclusive right at issue

in the case—the right to prepare derivative works—so he lacked standing to sue for

infringement caused by a derivative work); 3 MELVILLE B. NIMMER & DAVID

NIMMER, NIMMER ON COPYRIGHT § 12.02 (2021). This Court has found that

a ***contractual right*** to serve as an "exclusive agent" with an "exclusive right to

authorize ***others*** to use" a copyrighted work is not the same as ownership of an

exclusive right under copyright law protected under Section 106 of the Copyright

Act. *Original Appalachian*, 679 F. Supp. at 1572 (emphasis added). Such an agent

"is not a copyright owner and, consequently, lacks standing" to bring a copyright

infringement action. *Id.* Other courts, including the prior New York forum, agree.[2]

---

[2] *See, e.g.*, *Plunket v. Doyle*, No. 99 CIV 11006 (KMW), 2001 U.S. Dist. LEXIS
2001, 2001 WL 175252, at *5 (S.D.N.Y. Feb. 22, 2001) (plaintiff who claimed to
have the "exclusive worldwide rights to manage, as well as to negotiate, license, and
otherwise cause and permit the exploitation" of works lacked standing under the
Copyright Act). *See also, e.g.*, *Viesti Assocs. v. McGraw-Hill Global Educ.
Holdings, LLC*, No. 12-cv-00668-WYD-DW, 2015 U.S. Dist. LEXIS 16601, at *18
(D. Colo. Feb. 11, 2015) ("Agency Agreements merely appoint Viesti 'an exclusive
agent and representative' and fail to transfer any exclusive licenses. . . There is
nothing in these agreements that restricts the photographers from licensing the same
images on their own behalf or prosecuting all other infringements, thus, Viesti has
not demonstrated that it received an exclusive license . . . I find that the Agency
Agreements confer a non-exclusive license to Viesti, which confers no standing to
bring a copyright infringement claim."); *Getty Images (US) Inc. v. Advernet, Inc.*,
797 F. Supp. 2d 399, 416, 423 (S.D.N.Y. 2011) (similar).

### b.  Motion to Dismiss Under Rule 12(b)(6) for Dispositive Fair Use

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts "to state a claim to relief that is <u>plausible</u> on its face," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (emphasis added). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id*. And while allegations should be accepted as true, "mere conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). "When plaintiffs 'have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010). The Court may properly decide fair use on a motion to dismiss where, as here, "the only two pieces of evidence needed to decide the question of fair use" are "the original version" and the allegedly infringing version. *Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013).

Under the Copyright Act, "fair use" is a complete defense to infringement. 17 U.S.C. § 107; *see Marano v. Metro. Museum of Art*, 844 F. App'x 436, 439 (2d Cir.), *cert. denied*, 142 S. Ct. 213, 211 L. Ed. 2d 92 (2021) (affirming a district court's judgement to grant a motion to dismiss due to a fair use exception); *see also Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 694 (7th Cir. 2012);

*Hughes v. Benjamin*, 437 F. Supp. 3d 382, 395 (S.D.N.Y. 2020) (dismissing based on a fair use defense because the court can review the two works at issue and the context of how they were sold or posted).[3] "From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, [t]o promote the Progress of Science and useful Arts . . . ." *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 575 (1994) (citing U.S. Const., Art. I, § 8, cl. 8). Under the fair use doctrine, use of a copyrighted work "for purposes of criticism, comment, news reporting, teaching[,] scholarship, or research, is not an infringement of copyright." *Id.* at 576. (fair use "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.").

The Copyright Act lists four factors for analyzing fair use: "(1) the purpose and character of the use[;] . . . (2) the nature of the copyrighted work[;] . . . (3) the amount and substantiality of the portion used[;] . . . and (4) the effect of the use upon the potential market for . . . the copyrighted work." *Campbell*, 510 U.S. at 575. When weighing the four factors "[a]ll [factors] are to be explored, and the results

---

[3] *See also Yang v. Mic Network, Inc*., 405 F. Supp. 3d 537, 548 (S.D.N.Y. 2019) (holding that a transformative fair use was sufficient to grant a motion to dismiss); *Galvin v. Illinois Republican Party*, 130 F. Supp. 3d 1187, 1197 (N.D. Ill. 2015) (holding that a plaintiff's copyright infringement claims should be dismissed because they are precluded by the defendant's affirmative defense under § 107).

weighted together in light of the purposes of copyright." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1268 (11th Cir. 2001).

For the first factor, considering the purpose and the character of the use of the work requires:

> . . . consideration of "(1) whether the use serves a nonprofit educational purpose, as opposed to a commercial purpose; and (2) the degree to which the work is a transformative use, as opposed to a merely superseding use, of the copyrighted work." . . . A use is transformative when it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message."

*Katz v. Google Inc.*, 802 F.3d 1178, 1182 (11th Cir. 2015) (citing *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) ("The use of a copyrighted work need not alter or augment the work to be transformative in nature.")). "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Suntrust Bank*, 268 F.3d at 1269. The transformative use consideration is essential because "the goal of copyright[s are] to promote science and the arts, [and] is generally furthered by the creation of transformative works." *Id.*

As to the second factor, the nature of the copyright work, the court should consider "(1) whether the work was previously published and (2) whether the work is primarily creative or factual." *Katz*, 802 F.3d at 1183. Copyright protections apply

more broadly to creative and unpublished works. *Id.* If a work is published prior to the defendant's use, then this factor weighs in favor of fair use. *Id.* Eleventh Circuit courts have also previously held that the "law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Id.* Therefore, if a work is primarily factual, then the factor weighs in favor of fair use as well. *Id.*

For the third factor, the court must consider the amount or portion in relation to the copyrighted work as a whole. *Id.* at 1183. This factor "weighs less when considering a photograph—where all or most of the work often must be used in order to preserve any meaning at all—than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value." *Id.* at 1183–84 (stating that a drawing is not meaningfully divisible).

Finally, the fourth factor seeks to answer a central question of whether the alleged use would "cause *substantial* economic harm such that allowing [the conduct] would frustrate the purposes of copyright by materially impairing [the defendant's] incentive to publish the work." *Id.* at 1184 (emphasis in original). "[T]he only harm to derivatives that [] concern [the courts] is the harm of market substitution." *Suntrust Bank*, 268 F.3d at 1274.

## IV.   **ARGUMENT**

Ms. Torres moves for dismissal under Rule 12(b)(1) of the Federal Rules of

Civil Procedure on the grounds that CPi lacks standing to bring this action. Ms. Torres also moves for dismissal under Rule 12(b)(6) there are no facts alleged with regard to copyright management information violations, the Accused Works are lawful "fair use," and there is no set of facts through which CPi could state a claim for copyright infringement. Each basis is addressed in turn below.

### a.   CPi Fails to Plead Facts to Plausibly Allege Standing

Ms. Torres asks this Court to dismiss all counts of the Complaint as a result of CPi's lack of standing. The law is clear that only (1) owners of copyrights and (2) persons who have been granted exclusive licenses by owners of copyrights have standing to sue for copyright infringement. *Pro. LED*, 88 F. Supp. 3d at 1369. In this case, CPi fails to allege facts to show that it is either a copyright owner or an exclusive licensee of the Asserted Work. In fact, CPi points to evidence that conclusively establishes they were at most a mere agent by contract, not an owner of any legal or beneficial rights in the Asserted Work necessary to create standing.

With its Amended Complaint, CPi provides a copy of the Agency Agreement with Afanador that CPi contends provides it rights that support standing to assert the instant copyright claims. Doc. 29-6. First, and dispositively, the Agency Agreement is a contract to provide Afanador with representation, not a copyright license to CPi. Second, even assuming the Agency Agreement could convey Copyright Act rights

to CPi, it confirms that Afanador owns the Asserted Work and retains other substantial rights that foreclose any finding that CPi has "exclusive" license rights to support standing. Third, the Agency Agreement specifically *does not* grant CPi rights in derivative works, yet that is the right specifically placed at issue in this case. The Agency Agreement cannot, as a matter of law, establish CPi's standing.

### i. CPi's right to authorize others' exploitation of the Asserted Work is not enforceable under the Copyright Act.

The Northern District of Georgia has specifically rejected that an exclusive agency agreement provides standing to sue under the Copyright Act. *Original Appalachian*, 679 F. Supp. at 1572. More specifically, the Court held that a grant, as here, of the right to act as an "exclusive agent" for a copyright owner in authorizing *others* to use a copyrighted work is a mere *contractual* right, not a *copyright* enforceable under the Copyright Act. *Id.* CPi's purported contractual right to "authorize" others to exploit the Asserted Work (i.e., through sale, license, syndication, and marketing) is simply not a transfer of ownership-based exclusive rights in the Asserted Work that are protected under Section 106 of the Copyright Act. *Id.* Thus, CPi "is not a copyright owner and, consequently, lacks standing" to bring a copyright infringement action. *Id.*; *see supra* n.2 (collecting cases).

### ii. CPi's alleged rights are not ownership or exclusive.

Copyright ownership originally vests in the author of the work – here,

Afanador. 17 U.S.C. § 201(a) (copyright "vests initially in the author or authors of the work"). CPi has not pleaded that it is a co-author of the Asserted Work. CPi also has not pleaded the existence of an assignment of ownership in the Asserted Work from Afanador to CPi. Despite continued contradiction in CPi's Amended Complaint, CPi has also now incorporated into its pleading the Agency Agreement that conclusively establishes CPi it is not the owner of Afanador's Asserted Work.

The Agency Agreement does not transfer ownership of any work by Afanador to CPi, including the Asserted Work. *See generally* Doc. 29-6. There is no language describing a transfer of ownership. *Id*. The Agency Agreement actually specifically **requires** the opposite – that Afanador must remain the "sole owner of the copyright" in his Accepted Images for the duration of the agreement term. *Id.* at p. 1. Thus, CPi has not plausibly pleaded ownership of the Asserted Work to support standing.

The Amended Complaint also continues to plead outright that CPi is not an exclusive licensee, despite conclusory statements otherwise. The Agency Agreement preserves more than substantial rights for Afanador, including the same rights that CPi attempts to assert here – the rights to use, reproduction, publication, distribution, and authorization of a derivative. The Agency Agreement only purports to prohibit Afanador from offering the Accepted Images "for sale or syndication" to another during the term. *Id.* It does not otherwise restrict Afanador from licensing,

15

reproducing, distributing, or displaying his images, or prohibit Afanador from authorizing derivative works of his images, or grant CPi the right to bring legal claims based thereon. *See generally* Doc. 29-6.

Afanador can further terminate the without cause and trigger a reversion of any rights discussed in the agreement back to himself. *Id.* at Agreement p. 1. And, should CPi ever wish to transfer any of its rights under the Agency Agreement to another, CPi would be required to get Afanador's written consent. *Id.* at Agreement p. 2. All of the foregoing defeats CPi's alleged exclusivity. *See, e.g.*, *Hyperquest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377, 381-86 (discussing similar subdivision of rights). In the light most favorable to CPi, both CPi and Afanador split rights to use, reproduction, publication, and distribution of the Asserted Works, them non-exclusive and foreclosing CPi's standing. *Saregama India Ltd*., 635 F.3d at 1291.

### iii.  The Agency Agreement omits "derivative work" rights.

Even assuming the Agency Agreement granted CPi an exclusive license to ownership rights that are enforceable under the Copyright Act, it makes no reference to the operative right in this case – derivative work rights. The Amended Complaint sets out unequivocally that the action is "based on the Defendants' blatant, willful, and unauthorized use, reproduction, publication, and distribution ***of a derivative version*** of Afanador's 2009 black and white photographic portrait of the U.S.

Supreme Court Justice Ruth Bader Ginsburg." Am. Compl. ¶ 12. Further still, CPi pleads that Defendants "knew or should have known that any ***uses of Plaintiff's copyrighted work as a derivative work*** would require a license by Plaintiff or Afanador" to avoid infringement. *Id.* ¶ 13.

In a light more than favorable to CPi that assumes an exclusive license to a subset of rights (i) the Agency Agreement would only arguably cover rights to sell, syndicate, license, market, or otherwise distribute original photographs, and (ii) only outright sale and syndication could be "exclusive" because the other rights are shared with Afanador. The right to authorize or create derivatives is not referenced in the Agency Agreement and would therefore not even be a *shared* between CPi and Afanador. Derivative work rights would be held exclusively by Afanador, foreclosing CPi's standing to assert such a claim in this case. *See*, *e.g.*, *Roberts v. Gordy*, 359 F. Supp. 3d 1231, 1240-41 (S.D. Fla. 2019) (rejecting standing to assert rights to prepare derivative works even where plaintiff was receiving related royalties in the original); *Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*, 747 Fed. Appx. 3, 6 (2d Cir. 2018) ("Because CAM lacks the exclusive right to exploit derivative works of Instrumental and Vocal, CAM lacks standing to bring suit against the defendants for copyright infringement."); *Fahmy*, 908 F.3d at 394 (similar).

### b.  CPi Fails to State a Plausible DMCA Claim

CPi's newly asserted claim related to removal of copyright management information under the DMCA is nothing more than a regurgitation of the legal standard with no underlying facts and no differentiation between the various "Defendants" lumped together and implausibly alleged to have acted identically. *See* Am. Compl. ¶¶ 53-56. Such general allegations fail to state any claim, let alone a plausible one, and should be dismissed. *Appsoft Dev., Inc. v. Diers, Inc.*, No: 3:13-cv-1520, 2014 U.S. Dist. LEXIS 109712, at *13-14 (M.D. Fla. Aug. 8, 2014).

### c.  The Torres Works are Transformative Fair Uses That Cannot be Copyright Infringement as a Matter of Law

In this case, even with an assumption that all of the allegations in the complaint are true, CPi would not be entitled to relief because Ms. Torres has made only fair use of the Asserted Works as a matter of law. Under the fair use doctrine, a court must consider: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use on the market for the original. *Campbell*, 510 U.S. at 575.

The purpose and character behind Ms. Torres' work is transformative because Ms. Torres' work portrays a wild, scattered, rebellious character compared to the original work. Moreover, the nature of the original work is factual because it merely portrays a traditional portrait of Justice Ginsburg—and factual works are not

afforded as much protection as creative works. *Suntrust Bank*, 268 F.3d at 1271. Ms. Torres only used enough of the original work to conjure up the original in the minds of the audience, which in the circumstance was reasonable and weighs in favor of fair use. And, Ms. Torres' Accused Works do not impact the CPi's licensing market for a black-and-white portrait photograph, let alone substitute it. The only "evidence" needed to decide this case in Ms. Torres' favor is the Asserted and Accused Works already in the record. *Cariou*, 714 F.3d at 707.

### i. The character of the accused uses is transformative.

As to the first fair use factor, Ms. Torres' works are a transformative fair use of the Asserted Work that cannot be an infringement. Acknowledging the transformative nature of Ms. Torres' Accused Works is essential because the "goal of copyright[s are] to promote science and the arts."[4] *Suntrust Bank*, 268 F.3d at 1269. In this case, ordinary observers would instantly identify that the Accused Works convey the antithesis of what CPi alleges is distinctive in the Asserted Work. Most importantly the Accused Works *reject* the 'scholarly' feeling to which CPi ascribes primary significance and replaces it with wild, rebellious, casual, scattered, neon colored, animal printed, contemporary, light and ebullient features—an

---

[4] "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Suntrust Bank*, 268 F.3d at 1269.

obvious commentary[5] that Justice Ginsburg exists beyond the traditional stoic jurist captured by Afanador. *See Brownmark*, 682 F.3d at 693 (where the accused work commented on the original work by imitating parts of the creation). The Accused Works have a "different character," give Afanador's photographs a "new expression," and employ new aesthetics with creative and communicative results distinct from Afanador's. Ms. Torres has not presented the same material as Afanador in a different manner, but instead "communicates something new and different from the original [and] expands its utility, thus serving copyright's overall objective of contributing to public knowledge." *Apple Inc.*, 510 F. Supp. 3d at 1286.

In *Gaylord v. United States*, which CPi relied on in response to Ms. Torres' New York motion to dismiss, the Federal Circuit found that a stamp did not sufficiently transform the character of copyrighted statues of soldiers in the Korean War, because the stamp was only a picture of the statutes covered in snow. *Gaylord v. United States*, 595 F.3d 1364, 1373 (Fed. Cir. 2010). Unlike the *Gaylord* case, in the present case, Ms. Torres' work of art takes the Asserted Work which portrays Justice Ginsburg in her traditional role in her judicial robes, and transforms Justice

---

[5] "[C]opying from an original for the purpose of criticism or ***commentary*** on the original or to provide information about it, tends most clearly to satisfy the notion of the 'transformative' purpose involved in the analysis of factor one." *Apple Inc. v. Corellium, LLC*, 510 F. Supp. 3d 1269, 1286 (S.D. Fla. 2020) (emphasis added).

Ginsburg's robes into a bright colored dress with the use of intricate weavings of paper covered with text of quotes from Justice Ginsburg—commenting on and highlighting Justice Ginsburg's contrarian support of women's rights and other civil liberties. The *Gaylord* case is therefore inapposite, as the Accused Works in this case are not just copies of the Asserted Work with minor changes caused incidentally by a weather forecast. *Id.*

However, the Court in *Gaylord* also discusses a case that closely resembles this one in finding transformative fair use, *Blanch v. Koons*. *Id.* In *Blanch v. Koons*, an artist incorporates a copyrighted photograph of a woman's feet with Gucci sandals into a collage with food products to make a commentary on consumerism. *Id.* at 1374 (citing *Blanch v. Koons*, 467 F.3d 244, 248 (2d Cir. 2006)). As in this case, in *Blanch*, the artist defendant changed the medium, color, background, and the details of the original work to "portray an entirely different purpose and meaning." *Blanch*, 467 F.3d at 253. In the *Blanch* case, the purpose of the original was to get "more of a sexuality to the photographs," whereas the adapted work wanted "the viewer to think about his/her personal experience with [the] objects, products, and images." *Id.* at 252. Comparably, in this case, the stated purpose behind the original work was to depict a "scholarly" version of Justice Ginsburg, whereas the Asserted Work wanted the viewer to think about the powerful feminine

and liberal side of Justice Ginsburg. Am. Compl. ¶ 14.

Finally, under the commercial versus educational purpose inquiry, though there is a commercial purpose behind the Accused Works in this case, the Court may "properly discount[] the secondary commercial nature of the use . . . [when] the work [is] substantially transformative." *Blanch*, 467 F.3d at 254. *See Suntrust Bank*, 268 F.3d at 1269 (for-profit status "overshadowed and outweighed" by highly transformative uses); *see also Apple Inc.*, 510 F.Supp.3d at 1289; *Campbell*, 510 U.S. at 584 ("nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism . . . 'are generally conducted for profit'"). The purpose and character of the Accused Works supports fair use.

### ii.  The Asserted Work is informational and published.

As to the second factor, the Court considers if the Asserted Work is (1) expressive or creative versus factual or informational and (2) unpublished versus published. *Katz*, 802 F.3d at 1182. In the Eleventh Circuit, where there is "no evidence in the record that [the plaintiff], the photographer, attempted to convey ideas, emotions, or . . . influence [the subject's] pose, expression, or clothing" then the work is considered "primarily a factual work." *Id.* at 1183.

Here, the Asserted Work is a traditional portrait of historical meaning, and there is no claim in the Complaint that Afanador contributed to the scene of Justice

Ginsburg as the subject, therefore the Asserted Work is "primarily a factual work." *Id.* As outlined in *Katz*, a work is primarily factual is there is "no evidence in the record . . . [that] the photographer, attempted to convey ideas, emotions, or in any way influence [the subject's] pose, expression, or clothing." *Id.* In this case, CPi fails to allege that the creator of the Asserted Work actually contributed by artistically and originally choosing the "silhouette of Justice Ginsburg, signature collar of her robe, fold of her hands . . . [or her] gaze." *Id.*; Compl. ¶ 14. Finally, the Asserted Work was also published in 2009, another fact in Ms. Torres' favor. *Id.* This factor, though, "rarely play[s] a significant role in the determination of a fair use dispute." *Apple Inc.*, 510 F. Supp. 3d at 1290 (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015)); *Yang*, 405 F.Supp.3d at 546.

### iii.  The substantiality of use of the Asserted Work is reasonable.

The third fair use factor concerns "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Courts consider "whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Apple Inc.*, 510 F. Supp. 3d at 1290 (alteration and quotation omitted). When the secondary use is transformative, it must be permitted "to 'conjure up' [enough of ] the original in the minds of the readership" to fulfill its transformative purpose." *Suntrust Bank*, 268 F.3d at 1272.

Here, the vast majority of the Accused Works are Ms. Torres' artistic weavings, colors, patterns, text, and the like. As in *Hughes*, what remains of the Asserted Work is enough to convey that the figure is Justice Ginsburg in a formal setting to fulfill the transformative purpose of juxtaposing her with elements directly contradictory to Afanador's purpose. *Katz*, 802 F.3d at 1184 (holding that a use of an original was fair even though the defendant "reproduced the Photo in its entirety and without alteration"). Where Afanador claims a "scholarly" impression, Ms. Torres conveys the opposite. The other allegedly distinctive elements of a "silhouette" pose, Justice Ginsburg's own decision to wear her "signature" collar, and that her hands are visible in her lap while seated, are not copyrightable,[6] nor does the Amended Complaint assert Afanador bore creative responsibility for them.

### iv.  There is no impact on the market for the Asserted Work.

Lastly, the fourth factor concerns "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The issue is not whether the secondary use harms "the market for derivative uses by the very effectiveness of its critical commentary," but whether it "brings to the marketplace a competing substitute for the original." *Suntrust Bank*, 268 F.3d at 1274. Usurpation

---

[6] *White v. Alcon Film Fund, LLC*, 52 F. Supp. 3d 1308, 1319 (N.D. Ga. 2014).

occurs when "the infringement impacted the market for the copyrighted work itself," and competes so as to "deprive the rights holder of significant revenues" because purchasers may substitute the copy for the original. *Apple Inc.*, 510 F. Supp. 3d at 1292. Here, Ms. Torres' transformative use does not usurp the original work's market. CPi does editorial and commercial photography licensing. Compl. ¶ 3. There is no explanation as to how Ms. Torres' sales of vibrant, mixed-media fine art that CPi claims command $12,000 per piece (*id.* ¶ 15), would impact—let alone usurp— CPi's licensing markets for a black-and-white portrait photograph. *See, e.g.*, *CCA & B, LLC v. F ± W Media Inc.*, 819 F. Supp. 2d 1310, 1323 (N.D. Ga. 2011) (versions of same subject matter appeal to different audiences).

As for any disturbance to the CPi's alleged "derivative" markets, "the only harm to derivatives that need concern [the courts] . . . is the harm of market substitution." *Campbell*, 510 U.S. at 593. There is no plausible pleading that the Accused Works will "significantly harm [the original's] derivatives." *Suntrust Bank*, 268 F.3d at 1276; *see also Galvin*, 130 F.Supp.3d. at 1196 (works "cater to wholly different audiences" when one is an "accurate depiction" of a subject, and the other is not). There is also no claim CPi would ever develop uses of the Asserted Work in the same market of Ms. Torres' artworks. The fourth factor also supports fair use.

## V.    <u>CONCLUSION</u>

For all of the foregoing reasons, CPi's Amended Complaint should be dismissed in its entirety.

Respectfully submitted this 6th day of April 2022.

*/s/ John M. Bowler*
John M. Bowler
Georgia Bar No. 071770
john.bowler@troutman.com
Lindsay Mitchell Henner
Georgia Bar No. 272310
lindsay.henner@troutman.com
TROUTMAN PEPPER
HAMILTON SANDERS LLP
600 Peachtree Street, NE, Suite 3000
Atlanta, Georgia 30308-2216
Telephone: (404) 885-3000
Facsimile: (404) 885-3900

*ATTORNEYS FOR DEFENDANTS
JULIE TORRES ART, LLC & JULIE
TORRES*

### <u>CERTIFICATION OF COMPLIANCE WITH LR 5.1</u>

Counsel for Defendants Julie Torres Art, LLC and Julie Torres certifies that this paper was prepared with Times New Roman 14-point font.

*/s/ John M. Bowler*
John M. Bowler

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| CREATIVE PHOTOGRAPHERS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION FILE NO. |
| | ) |
| JULIE TORRES ART, LLC and JULIE TORRES, | ) 1:22-cv-00655-JPB |
| | ) |
| Defendant. | ) |
| _____ | ) |

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2022, I electronically filed the foregoing document with the Clerk of Court using the EM/ECF System which will automatically send email notification of such filing to all attorneys of record.

This 6th day of April 2022.

*/s/ John M. Bowler*
John M. Bowler