**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| ———————————————————— | : | |
| CREATIVE PHOTOGRAPHERS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.: |
| | : | 1:22-cv-00655-JPB |
| JULIE TORRES ART, LLC, | : | |
| JULIE TORRES, | : | |
| MAUNE CONTEMPORARY, LLC, and | : | |
| INTERNATIONAL FINE ART | : | |
| DIRECT, LTD. | : | |
| | : | |
| Defendants. | : | |
| ————————————————————: | | |

<u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS JULIE TORRES ART, LLC AND JULIE TORRES' MOTION TO DISMISS PLAINTIFF CREATIVE PHOTOGRAPHERS, INC.'S FIRST AMENDED COMPLAINT</u>

TABLE OF CONTENTS

ARGUMENT                                                                          4


I.   STANDING                                                                     4

  A.  Background                                                                   4

  B.  CPI is the beneficial owner of an exclusive right under a copyright and thus is
      entitled and has standing to institute an action of infringement of the Work.   6

  C.  CPI's rights are exclusive                                                  11


II.  FAIR USE                                                                     13

  A.  The "Purpose and Character" of the Secondary Use                            15

  B.  The "Nature of the Copyrighted Work"                                        21

  C.  The "Amount and Substantiality of the Portion Used"                         23

  D.  The "Effect of the Use Upon the Potential Market for or Value of the
      Copyrighted Work"                                                           25


III. CONCLUSION                                                                   28

TABLE OF AUTHORITIES

*The Andy Warhol Found. for Visual Arts v. Goldsmith*, 992 F.3d 99
(2d Cir. 2021)                                                                 15, 16, 20, 24

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015)                           27

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014)                        19

*Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339 (S.D.N.Y. 2017)    27

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006)         25

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006)                                      14, 17-18

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012)                21

*Burns v. Rockwood Distributing Co.*, 481 F. Supp. 841 (N.D.Ill.1979)                   7

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)                       13, 14, 18, 26

*Capitol Recs., LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013)                5

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013)                                     14, 18

*Castle Rock Entertain. V. Carol Publish. Group*, 150 F.3d 132 (2d Cir. 1998)          25, 26

*Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007)                                           5

*Davis v. Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001)                                     26

*Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2020)                26

*DRK Photo v. McGraw-Hill Global Educ. Holdings, LLC,* No. 15-15106
(9th Cir. September 12, 2017)                                                        10, 11

*Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27 (2d Cir. 1982)        9

*Emerson v. Davies*, 8 F. Cas. 615 (No. 4,436) (C.C.D. Mass. 1845)                      13

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340(1991)                       14

*Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169 (2d Cir. 2018)                    26

*Gaylord v. United States*, 595 F.3d 1364 (Fed. Cir. 2010)                           16, 20

*Hamil Am. Inc. v. GFI*, 193 F.3d 92 (2d Cir. 1999)                                    6

*I.A.E., Inc. v. Shaver*, 74 f.3d 768 (7th Cir. 1996)                             10, 12

*Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998)               26

*Katz v. Google, Inc*., 802 F.3d 1178 (11th Cir. 2015)                            21

*Kienitz v. Sconnie Nation LLC*, 766 F.3d 756 (7th Cir. 2014)                 14, 16

*Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996 (2d Cir. 1995)                  24

*Leibovitz v. Paramount Pictures Corporation*, 137 F.3d 109, 115-16 (2d Cir. 1998)   26

*Malden Mills, Inc. v. Regency Mills, Inc.*, 626 F.2d 1112 (2d Cir. 1980)         24

*Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133 (2d Cir. 2004)           24

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.* 795 F.3d 997 (9th Cir. 2015)   9, 10, 12

*Mint, Inc. v. Amad*, 2011 WL 1792570                                              6

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012)                    22

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007)             18

*Plunket v. Estate of Dame Jean Conan Doyle* 99 Civ. 11006 (S.D.N.Y. Feb. 22, 2001)   8, 9

*Rentmeester v. Nike, Inc.*, 883 F.3d 1111 (9th Cir. 2018)                        22

*Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992)                            16, 20, 23, 25

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010)                                 25

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014)     22

*TCA Television Corp. v. McCollum*, 839 F.3d 168 (2d Cir. 2016)                   23

*Viesti Assocs. v. McGraw-Hill Global Educ. Holdings, LLC,*
No. 12-cv-00668-WYD-DW, 2015 U.S. Dist. LEXIS 16601                                 9

*Wales Industrial, Inc. v. Hasbro Bradley, Inc.*, 612 F. Supp. 510 (S.D.N.Y.1985)   7

*Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir. 1991)                       25

Other Authorities

17 U.S.C. 501                                                                                    4, 8

17 U.S.C. §§ 106                                                                               4, 7,8

17 U.S.C. § 101                                                                                  13

17 U.S.C. § 107                                                                                  23

# ARGUMENT

## I.  STANDING

### A.  Background

Plaintiff Creative Photographers, Inc. ("CPI") is a premier photographic syndication, licensing, and sales company based in New York, and it distributes to media outlets and publications photographs of models and celebrities created by internationally renowned photographers, including Ruvén Afanador ("Afanador"). By virtue of its contracts with its photographers, CPI is the sole and exclusive distributor and exclusive licensee of other copyrights for the photographers' works

This case involves Defendant's unauthorized reproduction, distribution, and display of one of Afanador's iconic images of Ruth Bader Ginsburg ("Work"). At all relevant times Afanador owned the copyright in the Work.

The Defendant has alleged in its Motion to Dismiss Plaintiff's Complaint (doc 22) and again in the Brief in Support of Motion to Dismiss Plaintiffs First Amended Complaint (doc 31), that the Plaintiff does not have standing to bring the claims presented in their Complaint (doc 1) and their First Amended Complaint (doc 29). The Plaintiff disagrees and will show how the Defendant has failed to present any valid support for its allegations.

 The facts in this case are that Afanador entered into an agreement with CPI which granted to CPI an exclusive license/right to, among other things, "sell, syndicate, license, market or otherwise distribute any and all celebrity/portrait photographs and related video portraits, submitted to us by you (Afanador) and accepted by us for exploitation for sale or syndication during the term of this Agreement (the "Agreement"). Further, under this Agreement, the copyright holder Afanador could not "offer any celebrity/portrait photographs for sale or

syndication to . . . any other agent, representative, agency, person, or entity during the Term of this Agreement."

Thus, it is clear on the face of the Agreement that CPI was granted the sole right to distribute, license, and sell the Work to third parties, and established that CPI has, at all times relevant to this action, been the exclusive administrator of the copyrights in and to the Work.

CPI has standing to bring this action. Section 501(b) provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. 501(b). And Section 106 of the Copyright Act grants "the owner of copyright under this title" certain "exclusive rights," including the right "to *distribute* copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership[.]" *Capitol Recs., LLC v. ReDigi Inc*., 934 F. Supp. 2d 640, 648 (S.D.N.Y. 2013), aff'd, 910 F.3d 649 (2d Cir. 2018) (emphasis added), citing 17 U.S.C. §§ 106(1), (3)-(5). As noted above, CPI holds an exclusive license from Afanador and, per its agreements with Afanador, is the beneficial owner of various copyrights in the Work.

Exclusive licenses grant to the licensee the exclusive right—superior even to copyright owners' rights—to use the copyrighted material in a manner as specified by the license agreement. *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007). Exclusive licenses are recognized as a type of an ownership interest, conveying a particular exclusive right of copyright. *Id.* at fn. 10, citing 17 U.S.C. § 101 ("'Copyright owner', with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right."). Exclusive licensees may sue for infringement without joining the copyright owners. 17 U.S.C. § 501(b).

CPI's exclusive license with Afanador covers the Work and its copyright, and CPI has produced the Certificate of Copyright for the Work. A "certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright." *Mint, Inc. v. Amad*, 2011 WL 1792570, at *2, quoting *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir. 1999). Afanador has an exclusive license and distribution agreement with CPI granting CPI an ownership interest in the Work and its copyright.

The Defendants argue that the Plaintiff CPI has failed to plead facts to plausibly allege standing (Section IV a). The Defendants argue the following points:

CPI's right to authorize others' exploitation of the Asserted Work is not enforceable under the Copyright Act and

CPI's alleged rights are not ownership or exclusive

**B.  CPI is the beneficial owner of an exclusive right under a copyright and thus is entitled and has standing to institute an action of infringement of the Work.**

The Plaintiff has presented clear and indisputable evidence that the Plaintiff indeed is the owner of an exclusive grant in and to the copyrights of the relevant Work.

The Agreement between CPI and Afanador (presented in Exhibit 6 of the First Amended Complaint (doc 29)) states:

> You (Afanador) retain CPi as your exclusive agent to sell, syndicate, license, market or otherwise distribute any and all celebrity/portrait photographs and related video portraits, submitted to us by you and accepted by us for exploitation for sale or syndication during the term of this agreement (the "Accepted Images"). You (Afanador) must be the sole owner of the copyright for all such photographs and may not offer any celebrity/portrait photographs for sale or syndication to or through any other agent, representative, agency, person or entity during the Term of this Agreement.

Upon review of this language, in consideration of the below-described case law, the Plaintiffs submit that the Plaintiff has ownership of a valid exclusive license conveying

copyrights to the Plaintiff, which fully coincides with the language of 501(b), and as such, has standing.

Plaintiff has demonstrated, and even provided conclusive evidence prior to discovery in the interest of furthering this case to settlement by introducing the Agreement into evidence, that the Plaintiff has multiple exclusive rights to bring this copyright infringement action. The Plaintiff has the exclusive rights to sell and distribute the Works, and to provide a license to others of any other Section 106 rights. Such a right that can only exist in the hands of one who holds exclusive rights in and to such enumerated Section 106 rights.

The Defendant cites *Original Appalachian*, 679 F. Supp. at 1572, a case that was before this Court, to support their allegations. The Defendant argues that this Court found that "a contractual right to serve as an 'exclusive agent' with an 'exclusive right to authorize others to use' a copyright work is not the same as ownership of an exclusive right under copyright law protected under Section 106 of the Copyright Act. The Plaintiffs respectfully submit, and are confident this Court will be well aware, the present facts are radically different than what is presented in *Original Appalachian*. In *Original Appalachian*, the plaintiff did not have an agreement that explicitly and exclusively conveyed rights under Section 106 of the Copyright Act. The plaintiff in *Original Appalachian* cited *Wales Industrial, Inc. v. Hasbro Bradley, Inc.*, 612 F. Supp. 510 (S.D.N.Y.1985), which dealt with distribution rights and *Burns v. Rockwood Distributing Co.*, 481 F. Supp. 841 (N.D.Ill.1979), which dealt with the manufacture, sale, and distribution rights. This Court agreed that these rights are expressly covered by section 106. However, in *Original Appalachian* the plaintiffs did not have an agreement that explicitly granted an exclusive license, but rather argued that the right to authorize others to use was

covered by Section 106 on the basis of the expansive language. Further, in *Original Appalachian*, there was no copyright registration.

In contrast, in the present case the Plaintiffs have a clear, explicit and exclusive grant of Section 106 rights in the Work, including an exclusive license to distribute (a right under 17 U.S. Code § 106(3)), an exclusive license to license the Works (a right under 17 U.S. Code § 106(1, 2, 3 and 5), an exclusive license to market (a right under 17 U.S. Code § 106(5) for who can market a product without displaying it?), and an exclusive right to syndicate [1](a right under 17 U.S. Code § 106(5)). Defendants are apparently attempting to limit the grant to Plaintiff to be merely "a contractual right to serve as an 'exclusive agent' with an exclusive right to authorize others to use the Work." By reading the text in the grant it is clear that CPI is the exclusive agent of multiple Section 106 rights and thus has standing under Section 501(b), thus rendering *Original Appalachian* as inapplicable.

Defendants also cite *Plunket v. Estate of Dame Jean Conan Doyle* 99 Civ. 11006 (KMW) (S.D.N.Y. Feb. 22, 2001). The Plaintiffs argue that the present facts are drastically different from those in *Plunket*. In *Plunket* the plaintiff alleged to have "exclusive management rights." The Court found that the Act provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." The Court went on to state that the "Second Circuit has interpreted Section 501(b) to limit standing to two types of claimants: '(1) owners of copyrights, and (2) persons who have been granted exclusive licenses by owners of copyrights'" citing *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 32 (2d Cir. 1982). The

---

[1] Merriam-Webster defines syndicate as (4) "a business concern that sells materials **for publication** in a number of newspapers or periodicals simultaneously". Selling and distributing for the purposes of publication or display clearly falls within the realm of Section 106(5).

Defendants have not disputed the copyright ownership of Afanador. As evidenced by the license submitted by Plaintiffs in their First Amended Complaint, Afanador, the undisputed copyright holder, granted an exclusive license to CPI under all of the enumerated rights under Section 106 of the Copyright Act. CPI did not receive a mere license to manage. CPI was granted an exclusive license of the Section 106 rights.  In *Plunket* the plaintiff did not even allege that she was an owner or an exclusive licensee and as such, the Court held the plaintiff did not have standing. However, in the present case, the Plaintiff does allege, and presents conclusive evidence that the Plaintiff holds an exclusive license for the rights enumerated in Section 106 of the Copyright Act.

In *Viesti Assocs. v. McGraw-Hill Global Educ. Holdings, LLC,* No. 12-cv-00668-WYD-DW, 2015 U.S. Dist. LEXIS 16601, there was an explicit assignment of copyright clearly for the purpose of assigning accrued causes of action. The Court held that this did not meet the standing requirement under Section 501(b). However, in the present case, the facts clearly demonstrate that the Plaintiff has legal title to multiple exclusive rights under Section 106 of the Copyright Act as shown above and hence, has standing under Section 501(b). The Agreement was not merely an assignment of rights simply for enforcement of infringement.

The Defendants did not cite or make reference to *Minden Pictures, Inc. v. John Wiley & Sons, Inc.* 795 F.3d 997 (9th Cir. 2015), 115 U.S.P.Q.2d 1576 (Decided Jul 29, 2015). *Minden* points out that "[a]ny of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred . . . and owned separately." 17 U.S.C. § 201(d)(2). Further, *Minden* states that "[E]ither an assignment (which transfers legal title to the transferee) or an exclusive license (which transfers an exclusive permission to use to the transferee) qualifies as a 'transfer' of a right in a copyright for the purposes of the Act."

*Minden*, 795 F.3d at 1003; *accord* 17 U.S.C. § 101. *Minden* held that the agreements at issue granted exclusive licenses of the right to authorize rendering Minden a legal owner with standing to sue. The Court further stated "[u]nder the Agency Agreements, Minden is the 'sole and exclusive agent and representative with respect to the Licensing of any and all uses' of the photographs". The Court held this even though the photographers retained the right to issue licenses themselves. Further, the Court stated "the essence of an 'exclusive' license under the Act is that 'the copyright holder permits the licensee to use the protected material for a specific use and further promises that the same permission will not be given to others' *I.A.E., Inc. v. Shaver*, 74 f.3d 768, 775 (7th Cir. 1996).

In the present case, as clearly established herein above, the Plaintiff received an exclusive license from Afanador for the various rights under Section 106.  Further, the agreement clearly states that Afanador could not offer any of the photographs of interest to any other agent, representative, agency, person, or entity.  The license between Afanador and Plaintiff is a transfer of a right in a copyright for the purpose of the Act and Plaintiff clearly has standing.

In *DRK Photo v. McGraw-Hill Global Educ. Holdings, LLC,* No. 15-15106 (9th Cir. September 12, 2017), the court held that *DRK* was a nonexclusive licensing agent for the photographs at issue and failed to demonstrate any adequate ownership interest in the copyrights to confer standing.  Quoting *Minden* the Court said "[w]e recently held . . . that a stock photography agency that served as the exclusive licensing agent for allegedly infringed photographs had standing to sue for infringement under the Copyright Act.  The Court, affirming the ruling in *Minden* said "[l]ike *DRK*, *Minden* also entered into agency agreements with its contributing photographers under which the photographers authorized Minden to license and sell certain photographs to third parties. *Minden* at 999-1000." The *DRK* Court then stated

"[i]mportantly, in those licensing agreements, the photographers agreed to appoint Minden 'as sole and exclusive agent and representative with respect to the Licensing of any and all uses of [specified photographs].' *Id*. at 1000." *DRK* at 11.

The Plaintiffs contend the Agreement between CPI and Afanador, similar to the agreement in *Minden*, clearly establishes standing for CPI.

## C.  CPI's rights are exclusive

The Defendant argues that the "Amended Complaint continues to plead outright that CPI is not an exclusive licensee, despite conclusory statements otherwise". The Defendant argues that the Agreement "only purports to prohibit Afanador from offering the Accepted Images 'for sale or syndication' to another during the Term. Defendant further argues that the Agreement does not restrict Afanador from licensing, reproducing, distributing, or displaying his images, or from authorizing derivative works of his images.

The Defendant is very eager to take liberties in limiting the grant language but are quite lenient when elaborating on the restrictions of Afanador. However, the Defendants' arguments are completely moot.

With all due respect to opposing counsel, the Plaintiff's state that this argument obfuscates the actual meaning of the Agreement by quoting excerpts and making conclusory and misdirected statements. For example, the language in the Agreement explicitly states that CIP exclusively has the license to "sell, syndicate, license, market or otherwise distribute any and all celebrity/portrait photographs and related video portraits". The nature of an exclusive license means that the Licensee is the only one authorized to take these actions. As such, Afanador is restricted from the right to "sell, syndicate, license, market or otherwise distribute any and all celebrity/portrait photographs and related video portraits", not just "sell or syndicate". Further, as

Afanador is restricted from licensing, that leaves CPI as the sole and exclusive licensor for all the Works, which inherently includes all of the enumerated rights under the Copyright Act Section 106, including the right to license the Works for the creation of derivative works. This is further evidenced in paragraph 4 of the Agreement which explicitly indicates that CPI can create derivative works.

However, as the Defendant will now appreciate in view of *Minden*, that even if the owner of the copyright retained some licensing rights, it does not negate the exclusive rights granted to the licensee. Looking again at *Minden*, the Court stated "[u]nder the Agency Agreements, Minden is the 'sole and exclusive agent and representative with respect to the Licensing of any and all uses' of the photographs". The **Court held this even though the photographers retained the right to issue licenses themselves**. Further, the Court stated "the essence of an 'exclusive' license under the Act is that 'the copyright holder permits the licensee to use the protected material for a specific use and further promises that the same permission will not be given to others' *I.A.E.* at 775. However, in the present case, the Agreement grants an exclusive license of Section 106 rights to CPI and further prohibits Afanador from granting the same to anyone else.

As such, the Plaintiffs state that they have, without a doubt, met the burden to establish standing in this copyright case by "clearly and specifically set[ting] forth facts sufficient to satisfy Article III standing requirements.

Once again, repeated for convenience, the Agreement between CPI and Afanador states:

You (Afanador) retain CPi as your exclusive agent to sell, syndicate, license, market or otherwise distrubte any and all celebrity/portrait photographs and related video portraits, submitted to us by you and accepted by us for your exploitation for sale or syndication during the

term of this agreement (the "Accepted Images"). You (Afanador) must be the sole owner of the copyright for all such photographs and may not offer any celebrity/portrait photographs for sale or syndication to or through any other agent, representative, agency, person or entity during the Term of this Agreement.

Upon review of this language, in consideration of the afore-described case law, the Plaintiffs submit that the Plaintiff has ownership of a valid exclusive license conveying Section 106 rights to the Plaintiff and as such, has standing.

If upon examination of the Agreement the Court does not believe an exclusive right under Section 106 of the Copyright Act has been granted to the Plaintiff, the Plaintiff respectfully request the Court to grant leave for the Plaintiff to file an amended complaint.

## II.  FAIR USE

Under the 1976 Act, copyright protection extends both to the original creative work itself and to derivative works, which it defines as, in relevant part, "a work based upon one or more preexisting works, such as a[n] . . . art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101.

The doctrine of "fair use" has developed along with the law of copyright. As Justice Story explained in *Campbell v. Acuff-Rose Music, Inc.*, "in truth, in literature, in science and in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science, and art, borrows, and must necessarily borrow, and use much which was well known and used before." 510 U.S. 569, 575, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), quoting *Emerson v. Davies*, 8 F. Cas. 615, 619 (No. 4,436) (C.C.D. Mass. 1845).

The fair use affirmative defense exists to advance copyright's purpose of "promot[ing] the Progress of Science and Useful Arts." U.S. Const. art. I, § 8, cl. 8; *see also Campbell*, 569, 575. The defense does so by allowing "others to build freely upon the ideas and information conveyed by a work." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350 (1991). But fair use "is not designed to protect lazy appropriators. Its goal instead is to facilitate a class of uses that would not be possible if users always had to negotiate with copyright proprietors." *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 759 (7th Cir. 2014).

The "ultimate test" of fair use is whether the progress of human thought "would be better served by allowing the use than by preventing it." *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013). In applying this test, a court considers: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.

The fair use doctrine seeks to strike a balance between an artist's intellectual property rights to the fruits of his own creative labor, including the right to license and develop (or refrain from licensing or developing) derivative works based on that fruit, and "the ability of [other] authors, artists, and the rest of us to express them or ourselves by reference to the works of others." *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006).

CPI represents many of the world's top commercial photographers, including Afanador. Afanador's photograph at issue in this matter is consistent with Afanador's signature style of portraiture; black and white, spare, direct, and full of emotional impact that demonstrates an intimacy and connection with his subjects; in this case, U.S. Supreme Court Justice Ruth Bader

Ginsburg. See www.ruvenafanador.com. In addition to the Work, Afanador has captured iconic portraits of a selection of the world's most influential individuals, including politicians, athletes, and artists. A partial selection of Afanador's subjects includes Diane Keaton, Kristen Stewart, Barak Obama, Oprah Winfrey, Joaquin Phoenix, and Margaret Atwood, and of course Justice Ginsburg. A partial list of Afanador's commercial clients includes *Time Magazine*, *Sports Illustrated*, *Travel and Leisure*, *Rolling Stone*, and *GQ*.

Despite the resulting visual simplicity of Afanador's images, including Work, all are the result of careful planning, timing, instinct, and technical decision making that is the result of decades of experimentation and practice. Attached hereto as **Exhibit 1** is a sample of Afanador's iconic images. CPI also has long and well-documented history of licensing the images of its photographers, including Afanador. See **Declaration of Geoff Katz.**

**A. The "Purpose and Character" of the Secondary Use**

Following the Supreme Court's decision in *Campbell*, courts assessments of the first fair use factor have focused chiefly on the degree to which the use is "transformative," i.e., "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." 510 U.S. at 579. However, the alteration of an original work with "new expression, meaning, or message," does not mandate the secondary work is automatically transformative. *The Andy Warhol Found. for Visual Arts v. Goldsmith*, 992 F.3d 99 (2d Cir. 2021).

In fact, courts have repeatedly observed an entire class of secondary works exists that add "new expression, meaning, or message" to their source material but are nonetheless specifically excluded from the scope of fair use: derivative works. For example, where a secondary work

does not obviously comment on or relate back to the original or use the original for a purpose other than that for which it was created, the bare assertion of a "higher or different artistic use," is insufficient to render a work transformative. *Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992). *Kienitz* held, "To say that a new use transforms the work is precisely to say that it is derivative and thus, one might suppose, protected under 17 U.S.C. 106(2).")*. 766 F.3d 756, 758 (7th Cir. 2014).

Most importantly, the secondary work itself must reasonably be perceived as embodying an *entirely distinct artistic purpose* (emphasis added), one that conveys a "new meaning or message" *entirely separate from its source material* (emphasis added), and its source material is in service of a "fundamentally different and new" artistic purpose and character, such that the secondary work stands apart from the "raw material" used to create it. *The Andy Warhol Found.*, at 113-4. Attached hereto as **Exhibit 2** is a selection of Derivative Works viewed side-by-side with Afanador's original Work. In addition to the obvious side-by-side comparison, Torres also stated one of her Derivative Works was a "traditional screen print," and only added a "small sample of some meaningful quotes" to the work after "reading judicial opinions and oral arguments." See https://www.wabe.org/podcasts/city-lights/artist-julie-torres/ (2:30-2:40, 3:30-3:45). "Wild" and "rebellious," as asserted by Torres in her Motion to Dismiss, it is not. If anything, adding quotes attributed to Justice Ginsburg adds to the scholarly gaze depicted in Afanador's Work. In this case, like *Gaylord v. United States*, there is no meaningful dispute that the overarching purpose and function of the Work and Torres' derivative works ("Derivative Works") are identical because they in the "essential sense they are portraits of the same person." 595 F.3d 1364, 1372-73 (Fed. Cir. 2010). Attached hereto as **Exhibit 3** is a side-by-side comparison between Lynn Goldsmith's original photograph and Warhol's derivative work.

Torres made simple, easy, and uncontroversial changes to Afanador's Work. In Derivative Works, the pattern of Justice Ginsburg's robe is always the same outline as Afanador's original image, and placement of Justice Ginsburg within the borders of the frame is always the same outline as Afanador's original image. If Torres was interested in fundamentally altering Work, she could have cropped Work, distorted the original perspective chosen by Afanador, or added elements that would have changed Work from a dignified portrait into something more politically charged. For example, Torres could have added a cigar to Justice Ginsburg's mouth or changed Justice Ginsburg's robe into a miniskirt. But Torres did none of these things, nor anything comparable that may have changed Afanador's stately image into something less so. Further, Torres's choice for patterns added to Derivative Works are not even her original design. In the end, Torres just takes the work of others and arranges them in slightly different settings.

In *Blanch*, defendant Koons used plaintiff Blanch's original photograph, depicting a woman's legs in high-heeled shoes, as part of a larger work in which he set it alongside *several other similar photographs* with "changes of its colors, the background against which it is portrayed, the medium, the size of the objects pictured, [and] the objects' details." 467 F.3d at 253. In so doing, Koons used Blanch's photograph "as raw material for an entirely different type of art ... that comment[ed] on existing images by juxtaposing them against others." *Id.* at 262. Attached hereto is **Exhibit 4** which shows Blanch's original image side-by-side with Koons' derivative work.

In this case, Afanador's Work does not perform the same purpose as the derivative works in *Blanch*. Rather Work serves as the clear centerpiece of Torres' Derivative Works, which include a random rotation of bright color and pattern choices, seemingly unconnected to their

corresponding titles and performing the identical role of changing the background and setting to Torres' display of Afanador's Work. Whether Torres imbued her works with "wild, rebellious, casual, scattered, neon colored, animal printed, contemporary, light, and ebullient features" (see Torres's Motion to Dismiss) is in the eye of the beholder. But Torres did not succeed in transforming Works into anything but different versions of Afanador's original image.

And in *Cariou*, the copyrighted works found to have been fairly used were, in most cases, juxtaposed with *other photographs* and "obscured and altered to the point that Cariou's original [was] barely recognizable." 714 F.3d at 710. This is not the case with Torres' Derivative Works, which simplistically alter the color of Justice Ginsburg's robe and background while leaving the most critical parts of Afanador's original image intact. In fact, the entire purpose of Torres' limited additions to Afanador's original photograph is for viewers *to be able to recognize* Justice Ginsburg.

Of course, the alteration of an original work "with 'new expression, meaning, or message,' "*Cariou* , 714 F.3d at 706, quoting *Campbell* , 510 U.S. at 579, 114 S.Ct. 1164, whether by the use of "new aesthetics," *id.* , quoting *Blanch* , 467 F.3d at 253, by placing the work "in a different context," *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007), or by any other means is threshold for a finding of transformativeness. However, any secondary work that adds a new aesthetic or new expression to its source material is not necessarily transformative. The *Cariou* case is an instructive example of this point. Each derivative work by defendant and serial copier Erik Prince undoubtedly imbued Cariou's original work with a "new aesthetic." Prince's *Canal Zone (2007)* is a collage of thirty-six of Cariou's photographs, most of which Prince altered by, for example, painting over the faces and bodies of Cariou's subjects, in some instances altering them significantly. *See Cariou*, 714 F.3d at 711. In

*Graduation*, Prince added blue "lozenges" over the eyes and mouth of Cariou's subject and pasted an image of hands playing a blue guitar over his hands. *Id.* Both of these works certainly imbued the originals from which they derive with a "new aesthetic;" Despite this, the Court held it could not "confidently . . . make a determination about their transformative nature as a matter of law." *Id.* Attached hereto as **Exhibit 5** is a side-by-side comparison of two of Patrick Cariou's original images and Richard Prince's derivative works.

A classic example of this relationship between original and derivative work is a film adaptation of a novel. Adaptations frequently add to their source material: characters are combined, eliminated, or created out of thin air; plot elements are simplified or eliminated; new scenes are added; the moral or political implications of the original work may be eliminated or even reversed, or plot and character elements altered to create such implications where the original text eschewed such matters. All of these editorial modifications are filtered through the creative contributions of the screenwriter, director, cast, camera crew, set designers, cinematographers, editors, sound engineers, and myriad other individuals integral to the creation of a film. In these cases, courts have recognized that "[w]hen a novel is converted to a film ... [t]he invention of the original author combines with the cinematographic interpretive skills of the filmmaker to produce something that neither could have produced independently." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 216 (2d Cir. 2015). Despite the extent to which the resulting movie may transform the aesthetic and message of the underlying literary work, film adaptations are identified as a paradigmatic example of derivative works. *See, e.g.*, *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014) ("Paradigmatic examples of derivative works include . . . the adaptation of a novel into a movie or a play.").

A common thread running through the above-cited cases is where a secondary work does not obviously comment on or relate back to the original or use the original for a purpose other than that for which it was created, the bare assertion of a "higher or different artistic use" is insufficient to render a work transformative. *Rogers,* 960 F.2d at 310. Rather, the secondary work itself must reasonably be perceived as embodying *an entirely distinct artistic purpose*, one that conveys a "new meaning or message" entirely separate from its source material. *Warhol* at 113.

Works that have satisfied the standard of a "higher or different artistic use" have themselves been distinct works of art that draw from numerous sources, rather than works that simply alter or recast a single work with a new aesthetic. *Id.*

There can be no meaningful dispute the overarching purpose and function of the two works at issue here is identical. Both were created as works of two-dimensional visual art, and both are portraits of the same universally-recognized person with the same profile, the same outline, and the same frame. *See Gaylord*, 1364, 1372-73. Afanador created Work using a combination and manipulation of the subject matter herself combined with his expertise of lighting and the photographic medium. Torres copied Work and placed it front and center of all her Derivative Works, then changed the least important and least impactful parts of the Work into random displays of colors and patterns, while leaving intact all the parts that a viewer needs to unmistakably identify the subject as Justice Ginsburg rather than, for example, Jane Goodall, another subject that forms the core of other derivative works produced by Torres. Attached hereto as **Exhibit 6** is Torres' Derivative Work based on Marco Grob's original portrait of Ms. Goodall.

Derivative Works retain the essential elements of the Work without significantly adding to or altering those elements, and therefore present the same work in a different form rather than make a transformative use of the original. Derivative Works retains all the essential elements of its source material, and Torres' modifications serve chiefly to magnify some elements of that material and minimize others. While the cumulative effect of those alterations may change the Work in ways that give a different impression of its subject, the Work remains the recognizable foundation upon which the Derivative Works are built.

In the end, the transformation inquiry is largely objective. Often the "only two pieces of evidence" that are "needed to decide the question of fair use . . . are the original version . . . and the [secondary use] at issue." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). "[W]hat is critical is how the work in question appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work." *Cariou*, 714 F.3d at 707.

The statutory language of the first factor also specifically directs courts to consider "whether [the] use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. 107(1). Torres produced Derivative Works explicitly for commercial gain. Attached hereto as **Exhibit 7** which contains a partial set of examples of Torres' sales of Derivative Works.

## B.  The "Nature of the Copyrighted Work"

For the second fair use factor, the nature of the copyrighted work, the Court considers if the original work is: (1) expressive or creative versus factual or informational; and (2) unpublished versus published. *Katz v. Google, Inc*., 802 F.3d 1178, 1182 (11th Cir. 2015). Although courts are required to consider and weigh this factor, it "has rarely played a significant role in the determination of a fair use dispute." *Google*, 804 F.3d at 220. That said, the second

statutory fair use factor is focused on the nature of the original work, not on the nature of the defendant's use (which is the focus of the first fair use factor). Afanador's Work in this case is undoubtedly a highly creative and expressive, not factual, work.

Additionally, the "nature of the copyrighted work" requires a court to determine the level of protection an original work merits. 17 U.S.C. § 107(2). In doing so, a court assesses "the 'thickness' or 'thinness' of [the author's] exclusive rights" and asks "whether or not the [work] had been published at the time of [secondary] use." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 87 (2d Cir. 2014). Some works are closer to the core of intended copyright protections than others and therefore have thicker rights. *Campbell*, 510 U.S. at 586. This factor teaches that "fair use is more difficult to establish" when such works are copied. *Id.*

When determining the thickness of a photograph's copyright, a court weighs the "range of creative choices available in selecting and arranging the photo's elements," examining aspects like "lighting, camera angle, depth of field, and selection of foreground and background elements." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1120–21 (9th Cir. 2018). The ultimate task is to separate the "facts or ideas set forth in a work," which are not protected, from the "author's manner of expressing those facts and ideas," which is protected. *Google* at 220. For a record of Afanador's style and technique, see http://www.faheykleingallery.com/artists/ruven-afanador/biography, https://www.all-about-photo.com/photographers/photographer/1404/ruven-afanador, http://www.focusphotomag.com/galleryfocus/ruven-afanador-torero-exhibit-october-28th2021-february-26th-2022/, https://www.youtube.com/watch?v=tzaL8CzF_LQ, https://www.rizzolibookstore.com/ruven-afanador-angel-gitano-men-flamenco,

Torres' assertion Work is "primarily a factual work" and "there is no evidence in the record . . . [that] the photographer, attempted to convey ideas, emotions, or in any way influence

[the subject's] pose, expression, or clothing" is categorically false and offensive to the core. As a basic matter, photographs are "generally viewed as creative, aesthetic expressions of a scene or image" and have long received thick copyright protection. *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1177 (9th Cir. 2012). This is so even though photographs capture images of reality. *See id.* ("Simply because a photo documents an event does not turn a pictorial representation into a factual recitation.") But more importantly, Torres recklessly ignores the fact Afanador is an internationally acclaimed photographer and fine artist who gained his reputation for his ability to both visualize and execute intimate, visually arresting images of his subjects. Perhaps that is the reason Torres chose to copy and use Work as the centerpiece of her Derivative Works, as opposed to an image of Justice Ginsburg at her swearing-in as a U.S. Supreme Court Justice.

## C. The "Amount and Substantiality of the Portion Used"

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). "In assessing this factor, we consider not only 'the quantity of the materials used' but also 'their quality and importance'" in relation to the original work. *TCA Television Corp. v. McCollum*, 839 F.3d 168, 185 (2d Cir. 2016)**,** quoting *Campbell*, 510 U.S. at 587, 114 S.Ct. 1164.

The ultimate question under this factor is whether "the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164 (citation and internal quotation marks omitted). Copyright protects not ideas, but "the original or unique way that an author expresses those ideas, concepts, principles, or processes." *Rogers*, 960 F.2d at 308. As applied to photographs, this protection encompasses the photographer's "posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved." *Id.* at 307. The cumulative

manifestation of these artistic choices – and what the law ultimately protects – is the image produced in the interval between the shutter opening and closing, *i.e.*, the photograph itself, or the photographer's "particular expression" of the idea underlying his photograph. *Leibovitz v. Paramount Pictures Corporation*, 137 F.3d 109, 115-16 (2d Cir. 1998).

Afanador has no monopoly on Ruth Bader Ginsburg's face or appearance, but the law grants Afanador and therefore CPI a broad monopoly on Ginsburg's image as it appears in Work. *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 136-37 (2d Cir. 2004). When the secondary user (Torres) has used the photograph itself, rather than, for example, a similar photograph, the photograph's specific depiction of its subject cannot be neatly reduced to discrete qualities such as contrast, shading, and depth of field that can be stripped away, taking the image's entitlement to copyright protection along with it. *Warhol* at 119.

The Derivative Works borrow significantly from the Work, both quantitatively and qualitatively. While Torres did add color and patterns to portions of the Work, the end product is not just works identifiably based on an image of Justice Ginsburg but works readily identifiable as deriving from a *specific* photograph of Justice Ginsburg. In this case, Afanador's iconic photograph of Justice Ginsburg.

 In the end, two works are substantially similar when "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1003 (2d Cir. 1995), quoting *Malden Mills, Inc. v. Regency Mills, Inc.*, 626 F.2d 1112, 1113 (2d Cir. 1980).

Torres has conceded the Work served as the "raw material" for the Derivative Works. Torres did not create the Derivative Works by taking her own photograph of Justice Ginsburg in a similar pose as in the Work. Nor did Torres attempt to copy merely the "idea" conveyed in the

Work. Torres produced the Derivative Works by copying the Work itself – *i.e.*, Afandor's *particular expression* of that idea.

Whatever the effect of Torres' alterations, the "essence" of Afanador's photograph "was copied" and persists in the Derivative Works. See *Rogers*, 960 F.2d at 311. Indeed, Torres' Derivative Works had the effect of *amplifying*, rather than minimizing, certain aspects of the Work.

### D. The "Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work"

The fourth factor asks "whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006). "Analysis of this factor requires us to balance the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." *Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991) (internal quotation marks omitted). In assessing market harm, the court asks not whether the second work would *damage* the market for the first (by, for example, devaluing it through parody or criticism), but whether it *usurps* the market for the first by offering a competing substitute. *See, e.g.*, *Bill Graham Archives* at 614.

This analysis embraces both the primary market for the work and derivative markets that exist or its author might reasonably license others to develop, *regardless of whether the particular author claiming infringement has elected to develop such markets* (emphasis added). *See Salinger v. Colting*, 607 F.3d 68, 74, 83 (2d Cir. 2010). The first and fourth factors are closely linked, as "the more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original." *Google* at 223, citing *Campbell*.

The question under this factor is not solely whether the secondary work harms an *existing* market for the specific work alleged to have been infringed. *Castle Rock Entertain. V. Carol Publish. Group*, 150 F.3d 132, 145-46 (2d Cir. 1998) ("Although *Castle Rock* has evidenced little if any interest in exploiting this market for derivative works . . . the copyright law must respect that creative and economic choice."). Rather, it is whether "unrestricted and widespread conduct of the sort engaged in by the infringer would result in a substantially adverse impact on the potential market" for the Work. *Campbell*, at 590 (internal quotation marks omitted).

Courts have never held the rightsholder bears the burden of showing actual market harm. Fair use is an affirmative defense. The ultimate burden of proving the secondary use does not compete in the relevant market is carried by the party asserting the defense. *See Campbell* at 590 ("Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets."); *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998) ("As always, [the secondary user] bears the burden of showing that his use does not" usurp the market for the primary work); *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020) ("Not much about the fair use doctrine lends itself to absolute statements, but the Supreme Court and our circuit have unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use.").

In this case, the potential harm extends to the derivative market. Although courts do not always consider lost royalties from the challenged use itself under the fourth factor (as any fair use necessarily involves the secondary user using the primary work without paying for the right to do so), courts do consider them where the secondary use occurs within a traditional or reasonable market for the primary work. *See Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d

169, 180 (2d Cir. 2018); *On Davis v. Gap, Inc.*, 246 F.3d 152, 176 (2d Cir. 2001). CPI has a demonstrated history of licensing Afandor's images for use in the derivative market. See **Exhibit 1 of Katz Declaration**.

Further, the court also must consider the impact on this market if the sort of copying in which Torres engaged were to become a widespread practice. Such harm is self-evident. There currently exists an extensive and diverse market to license photographs of celebrities, whether politicians, musicians, or judges. CPI regularly licenses its photographers' images to advertisers, book publishers, and other third parties for non-editorial use. Attached hereto as **Exhibit 7** is a selection of third parties and the corresponding uses to which CPI licenses its photographers' images.

If there was no barrier to serve as the basis of a stylized derivative image; permitting this use would effectively destroy that broader market, as, if artists "could use such images for free, there would be little or no reason to pay for [them]." *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 355 (S.D.N.Y. 2017); *see also Seuss*, 983 F.3d at 461 ("[T]he unrestricted and widespread conduct of the sort ComicMix is engaged in could result in anyone being able to produce" their own similar derivative works based on *Oh, the Places You'll Go!*). This, in turn, risks disincentivizing artists from producing new work by decreasing its value – the precise evil against which copyright law is designed to guard.

Although the primary market for the Work and the Derivative Works may differ, the Derivative Works pose cognizable harm to CPI's market to license the Work to publications for editorial purposes and to other artists to create derivative works based on the Work.

The fourth fair use factor must be assessed with an understanding that, if financial rewards are separated from content creation, authors may lose their ability to recoup the

inevitable costs of creation and suffer a diminished incentive to create – an outcome directly

contrary to the purposes of copyright law and the Constitution. *Authors Guild v. Google, Inc.*,

804 F.3d 202, 212 (2d Cir. 2015) ("The ultimate goal of copyright is to expand public knowledge

and understanding, which copyright seeks to achieve by giving potential creators exclusive

control over copying of their works, thus giving them a financial incentive to create informative,

intellectually enriching works for public consumption.").

<u>CONCLUSION</u>

WHEREFORE, for the above-stated reasons, Plaintiff CPI requests this court deny

Defendants Julie Torres Art, LLC, and Julie Torres' Motion to Dismiss Plaintiff Creative

Photographers, Inc.'s First Amended Complaint.

Dated: April 20, 2022

*/S/ Gregory S. Smith*
GREGORY SCOTT SMITH
State Bar No. 658377
1055 Prince Ave
Athens, GA 30606
(404) 643-3430, Telephone
gsmith@srtslaw.com
*Counsel for Plaintiff*

-and-

*/S/ David C. Deal*
David C. Deal
The Law Office of David C. Deal, P.L.C.
P.O. Box 625
Charlottesville, VA 22902
(434) 233-2727, Telephone
david@daviddeal.com
*Counsel for Plaintiff*
*Admitted Pro Hac Vice*