UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CREATIVE PHOTOGRAPHERS, INC., <br><br>        Plaintiff, <br><br>    v. <br><br> JULIE TORRES ART, LLC, JULIE TORRES, MAUNE CONTEMPORARY, LLC, AND INTERNATIONAL FINE ART DIRECT, LTD., <br><br>        Defendants. | CIVIL ACTION NO. <br> 1:22-CV-00655-JPB |

## <u>ORDER</u>

This matter comes before the Court on Julie Torres Art, LLC, and Julie Torres' (together, the "Torres Defendants") Motion to Dismiss Creative Photographers, Inc.'s ("Plaintiff") First Amended Complaint [Doc. 31]; the Torres Defendants' Motion to Disregard Plaintiff's Improper Response Brief [Doc. 35]; and Maune Contemporary, LLC, and International Fine Art Direct, Ltd.'s (the "Gallery Defendants") Motion for Joinder to the Torres Defendants' Motion to Dismiss and Motion to Disregard [Doc. 39]; [Doc. 41]. This Court finds as follows:

## BACKGROUND

**A.      Factual History**

Plaintiff, a New York corporation, is a commercial photography agency that represents portrait, lifestyle, beauty and fashion photographers, including Ruvén Afanador.  [Doc. 29, p. 2].  Julie Torres is a resident of Atlanta, Georgia, and the owner of Julie Torres Art, LLC.  Id. at 2–3.

This case concerns the alleged infringement of a copyrighted photograph of United States Supreme Court Justice Ruth Bader Ginsburg, taken in 2009 by Afanador (the "Afanador Work").[1]  See infra Figure 1.  Afanador's name and copyright information is displayed on primary sources of the Afanador Work that are featured online.  [Doc. 29, p. 8].  The Torres Defendants have produced screen prints, mixed media works and limited-edition prints that use the Afanador Work and that sell for up to $12,000.  Id. at 5.  The Court refers to these works collectively as the "Torres Works."  See infra Figure 2.

---

[1] Afanador, who is not a party to this action, owns the copyright to this image.  Plaintiff obtained a Certificate of Registration on behalf of Afanador from the United States Copyright Office.  See [Doc. 29-7].  The certificate has the registration number VA 2-252-202, an effective date of registration of February 5, 2021, and a registration decision date of May 21, 2021.  Id.



*Figure 1:  The Afanador Work,
titled "Ruth Bader Ginsburg"*



*Figure 2:  An example of the Torres Works,
titled "A Judge Grows in Brooklyn"*

Plaintiff asserts that it is the exclusive licensee of Afanador's photographs,

including the photograph at issue in this case.  [Doc. 29, p. 7].  Plaintiff and

Afanador entered into an agreement (the "Agreement") on December 14, 2015.[2]

[Doc. 29-6, p. 3].  Pursuant to the Agreement, Afanador retained Plaintiff as his

---

[2] Plaintiff included the Agreement as an exhibit to the Complaint.  See [Doc. 29-6].
Plaintiff also filed the Afanador Work, [Doc. 29-1], and examples of the Torres Works,
[Doc. 29-2]; [Doc. 29-3], with the Complaint.  Neither party disputes that the Court may
consider these attachments in the resolution of the instant Motion, and the Court agrees,
particularly because they are referred to in the Complaint and central to Plaintiff's claim.
Hoefling v. City of Miami, 811 F.3d 1271, 1277 (11th Cir. 2016) ("A district court can
generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and
if the allegations of the complaint about a particular exhibit conflict with the contents of
the exhibit itself, the exhibit controls.").

"exclusive agent to sell, syndicate, license, market or otherwise distribute any and all celebrity/portrait photographs and related video portraits, submitted to [Plaintiff] by [Afanador] and accepted by [Plaintiff] for exploitation for sale or syndication during the term of this Agreement (the 'Accepted Images')." Id. at 2. The Agreement provides that Afanador "must be the sole owner of the copyright for all such photographs and may not offer any celebrity/portrait photographs for sale or syndication to or through any other agent, representative, agency, person or entity during the Term of this Agreement." Id. Any "controversy" concerning the Agreement "shall be submitted to a Court of competent jurisdiction in the City and State of New York." Id. at 3. According to Plaintiff, the Agreement shows that Plaintiff is the "copyright owner or licensee of exclusive rights" regarding the Afanador Work.[3] [Doc. 29, p. 9].

Plaintiff discovered the Torres Defendants' allegedly unauthorized use of the Afanador Work on October 1, 2021. Id. at 8. Plaintiff asserts that the Torres Defendants "violated Plaintiff's exclusive rights of reproduction, preparation of derivative works, distribution, and public display" by copying and using the Afanador Work in the Torres Works. Id. at 10. Plaintiff alleges that the Torres Defendants explicitly omitted Afanador's name and copyright information before

---

[3] The Complaint, however, does not allege that the Afanador Work is an Accepted Image.

using the Afanador Work in the Torres Works and that Defendants (both the Torres

Defendants and the Gallery Defendants) refuse to acknowledge or credit Afanador

in any use of the photograph at issue.  Id. at 9.  Plaintiff also contends that the

Torres Defendants, without Plaintiff's permission or consent, authorized the public

display of the Torres Works to the Gallery Defendants and to the Metropolitan

Museum of Art, which is not a party to this action.  Id. at 10.  According to the

Complaint, all of Defendants' allegedly infringing actions were willful and

intentional.

**B.    Procedural History**

Plaintiff filed this action on November 19, 2021, in the Southern District of

New York.  [Doc. 1].  On February 16, 2022, the Southern District of New York

transferred the matter to this Court.  [Doc. 18].  The Torres Defendants moved to

dismiss the case on March 2, 2022.  [Doc. 22].  On March 23, 2022, Plaintiff filed

a First Amended Complaint, which is the operative complaint.  [Doc. 29].  The

Court then denied as moot the pending motion to dismiss.  [Doc. 30].

The First Amended Complaint brings two counts of copyright infringement

under the Copyright Act.  Count I is a claim for copyright infringement under 17

U.S.C. § 101 *et seq.* and is premised on Plaintiff's assertion that Defendants

violated Plaintiff's exclusive rights to the Afanador Work by publicly displaying

"infringing reproductions and derivative works."  [Doc. 29, pp. 9–10].  Count II is a claim for copyright infringement under 17 U.S.C. § 1202.  Id. at 12.  Count II is expressly based on the allegation that Defendants "knowingly and with the intent to conceal infringement[] intentionally removed the copyright management information" from the Afanador Work before displaying the Torres Works.  Id. Plaintiff seeks a declaration that Defendants' conduct violates Plaintiff's rights under the Copyright Act; injunctive relief; actual and statutory damages; and attorney's fees.  Id. at 13.

The Torres Defendants moved to dismiss the First Amended Complaint on April 6, 2022.  [Doc. 31].  Plaintiff responded to the Motion to Dismiss on April 20, 2022.  [Doc. 32].  The Torres Defendants subsequently filed a Motion to Disregard Plaintiff's Response Brief, arguing that the response failed to comply with the Local Rules of this Court.  [Doc. 35].  Plaintiff conceded that its response failed to comply with the Local Rules, see [Doc. 37], and filed a revised version of the response that addressed these issues, [Doc. 37-2].  After reviewing the papers and for good cause shown, the Motion to Disregard Plaintiff's Improper Response Brief is **GRANTED**.  The Court has nonetheless exercised its discretion to

consider the revised response brief, [Doc. 37-2], and has reviewed that filing in its consideration of the instant Motion to Dismiss.[4]

On May 31, 2022, the Gallery Defendants filed a Motion for Joinder, seeking to join in the Torres Defendants' Motion to Dismiss and Motion to Disregard Plaintiff's Improper Response Brief.[5] [Doc. 39]; [Doc. 41]. The Motion for Joinder is unopposed. See N.D. Ga. Civ. R. 7.1(B) ("Failure to file a response shall indicate that there is no opposition to the motion."). For good cause shown, the Motion for Joinder is **GRANTED**.

## LEGAL STANDARD

"At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir.

---

[4] The Court notes that the revised response brief contains numerous new facts that are not within the First Amended Complaint. The Court has disregarded any new facts in its resolution of the instant motion. See Dorman v. Aronofsky, 36 F.4th 1306, 1317 (11th Cir. 2022) ("[F]acts contained in a motion or brief 'cannot substitute for missing allegations in the complaint.'" (quoting EEOC v. Catastrophe Mgmt. Sols., 852 F.3d 1018, 1030 n.5 (11th Cir. 2016))); see also Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1284 (11th Cir. 2007) (recognizing a general rule that courts "do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss").

[5] The Motion for Joinder appears to have been filed in duplicate. See [Doc. 39]; [Doc. 41].

1999).  In determining whether this action should be dismissed for failure to state a claim, Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although detailed factual allegations are not necessarily required, the pleading must contain more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Importantly, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

## DISCUSSION

Defendants argue that this action should be dismissed because Plaintiff lacks standing under the Copyright Act and that, even if Plaintiff does have standing to sue for copyright infringement, it failed to state a claim to relief because the Torres Works are protected by the fair use doctrine, which is an affirmative defense.  The Court addresses these arguments below.

**A.    Standing**[6]

Section 501(b) of the Copyright Act contains a "statutory standing requirement."  Saregama India Ltd. v. Mosley, 635 F.3d 1284, 1290 (11th Cir. 2011).  To have statutory standing to bring an action for copyright infringement, a plaintiff must be the legal or beneficial owner of an exclusive right to a copyright. Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc., 70 F.3d 96, 99 (11th Cir. 1995); see also Saregama India, 635 F.3d at 1290–91 ("[O]nly the legal or beneficial owner of an 'exclusive right' has standing to bring a copyright infringement action in a United States court." (quoting 17 U.S.C. § 501(b)). "Exclusive rights" are defined in § 106 of the Copyright Act and include, as relevant here, reproducing the copyrighted work, preparing derivative works based upon the copyrighted work and distributing copies of the copyrighted work.  17 U.S.C. § 106.

---

[6] Defendants argue that this case should be dismissed for lack of standing under Federal Rule of Civil Procedure 12(b)(1).  See [Doc. 31, p. 1]; see also [Doc. 31-1, pp. 5–7]. Challenges to Article III standing implicate subject matter jurisdiction and are properly raised under Rule 12(b)(1), but "questions of 'statutory standing' (whether the plaintiff has satisfied the requirements under the statute to bring the action) collapse into an examination of the elements of the case and are more appropriately analyzed under Rule 12(b)(6)."  Page v. Regions Bank, 917 F. Supp. 2d 1214, 1216 (N.D. Ala. 2012).  The Court therefore analyzes Defendants' standing challenge under Rule 12(b)(6).

The rights in § 106 "are divisible, meaning that the owner may convey each one of them to a different person." HyperQuest, Inc. v. N'Site Sols., Inc., 632 F.3d 377, 382 (7th Cir. 2011) (citing 17 U.S.C. § 201(d)(2)). A "transfer of copyright ownership" occurs when a copyright owner conveys an exclusive license "of any of the exclusive rights comprised in a copyright," but a transfer of ownership does not occur when that owner conveys only a *nonexclusive* license. 17 U.S.C. § 101. Because a nonexclusive license does not convey an ownership interest, a nonexclusive licensee does not have standing to sue for copyright infringement. Davis v. Blige, 505 F.3d 90, 101 (2d Cir. 2007). "An exclusive license, on the other hand, conveys an ownership interest" sufficient to provide standing for an infringement suit. Id. Put simply, "[o]nly copyright owners and exclusive licensees may sue for infringement under the Copyright Act." Gym Door Repairs, Inc. v. Young Equip. Sales, Inc., 206 F. Supp. 3d 869, 893 (S.D.N.Y. 2016).

To determine whether Plaintiff has statutory standing, the Court must assess whether Plaintiff is a copyright owner or an exclusive licensee of the Afanador Work.[7]  This inquiry turns on the language of the Agreement, which the parties construe differently.  The relevant language is as follows:

---

[7] Section 501(b) recognizes that "beneficial" owners of a copyright have statutory standing, too.  However, the Court does not understand Plaintiff to argue that it is a beneficial owner of any copyright to the Afanador Work.  Being a "legal owner" and a

> You retain [Plaintiff] as your exclusive agent to sell, syndicate, license, market or otherwise distribute any and all celebrity/portrait photographs and related video portraits, submitted to us by you and accepted by us for exploitation for sale or syndication during the term of this Agreement (the "Accepted Images").  *You must be the sole owner of the copyright for all such photographs* and may not offer any celebrity/portrait photographs for sale or syndication to or through any other agent, representative, agency, person or entity during the Term of this Agreement.

[Doc. 29-6, p. 2] (emphasis added).  The italicized language plainly reserves ownership of the copyright in Afanador.  Because Plaintiff cannot be the copyright owner, the only avenue to standing is for Plaintiff to be an exclusive licensee.

Plaintiff interprets this excerpted language as granting it an exclusive license to the Afanador Work, contending that "[i]t is clear on the face of the Agreement that [Plaintiff] was granted the sole right to distribute, license, and sell" the Afanador Work.  [Doc. 37-2, p. 3].  Conversely, Defendants argue that the Agreement "is a contract to provide Afanador with representation, not a copyright license to [Plaintiff]."  [Doc. 31-1, p. 13].  The Court must determine whether the

---

"beneficial owner" under § 501(b) are two distinct concepts; a "beneficial owner" is one who does not possess legal title to the copyright yet receives royalties based on sales or license fees.  See Smith v. Casey, 741 F.3d 1236, 1241 (11th Cir. 2014).  One portion of Plaintiff's response brief is titled "[Plaintiff] is the beneficial owner of an exclusive right under a copyright."  [Doc. 37-2, p. 4].  Plaintiff did not develop this argument beyond this passing reference, and in the absence of any supporting facts, the Court does not address this issue any further.

Agreement, by appointing Plaintiff as Afanador's exclusive agent, confers standing under § 501(b).

Legal authority on this question—does an agreement appointing an entity as a copyright owner's exclusive agent provide statutory standing to sue for infringement?—is few and far between.  The leading case in the Eleventh Circuit appears to be Original Appalachian Artworks, Inc., v. Schlaifer Nance & Co., 679 F. Supp. 1564 (N.D. Ga. 1987).  In Original Appalachian, a court in this district held that an exclusive licensing agent lacked standing to sue for copyright infringement because its asserted right—the exclusive right to authorize *others* to use the copyright at issue—was not a § 106 right and was instead derived solely from the licensing contract.  Id. at 1572.  Given the few cases on this topic, the Court discusses Original Appalachian and others like it in detail.

Original Appalachian Artworks ("OAA") manufactured and produced what are today known as Cabbage Patch Kids.  Id. at 1567–68.  In March of 1982, OAA and Schlaifer, Nance & Co. ("SN & C") entered into a contract under which SN & C obtained "the exclusive worldwide rights to license the designs, trademarks, and

tradenames of OAA in the areas of subsidiary, literary, and audiovisual rights."[8]
Id. at 1568.

During the summer of 1982, SN & C, OAA and Coleco Industries, Inc. ("Coleco"), a leading toy company, engaged in negotiations for a licensing agreement involving the Cabbage Patch Kids.  Id. at 1569.  SN & C entered into a licensing agreement with Coleco in August of 1982, which OAA approved.  Id.  In 1983, OAA began manufacturing and selling a new product, a "Furskin" bear.  Id. at 1570.  In the fall of 1985, OAA negotiated a contract directly with Coleco to license the production of Furskin bears.  Id.

Meanwhile, OAA had become dissatisfied with SN & C's performance as its licensing agent and had "no interest" in using SN & C as its licensing agent for the Furskin bears.  Id.  However, SN & C argued that the Furskin bears were derived from the Cabbage Patch Kids and thus that the Furskin bears were covered under its March 1982 contract with OAA and its August 1982 contract with Coleco—

---

[8] Each of these terms were expressly defined in the contract.  To illustrate, "literary rights" were defined as "the rights to authorize third parties to prepare and reproduce materials in literary form" based on designs derived from "The Little People, Babyland General Hospital, Cabbage Patch, Cabbage Patch Kids, Preemies, and the Babyland General Stork."  Original Appalachian, 679 F. Supp. at 1568 (capitalization altered).  Under the March 1982 contract, SN & C thus obtained the exclusive worldwide rights to authorize third parties to prepare and reproduce literary materials based on designs derived from, for example, the Cabbage Patch Kids.

meaning that SN & C had a contractual right to serve as OAA's exclusive licensing agent for the Furskin bears.  Id. at 1570–71.  OAA sought a declaratory judgment to resolve the issue, and SN & C counterclaimed against OAA and Coleco for copyright infringement.  Id. at 1571.

SN & C contended that it had standing because "its exclusive rights to license others to use the copyrights at issue is one of the 'bundle of rights' protected by [§] 106."  Id.  The court determined that SN & C lacked standing to sue for copyright infringement because "any rights which SN & C possesses with respect to the copyrights involved in this litigation . . . are derived solely from the March 1982 contract with OAA and not from the copyright laws."  Id. at 1572.  In sum, "SN & C [was] not a copyright owner" and thus did not have standing to bring an action under the Copyright Act.  Id.

Defendants argue that Original Appalachian rather straightforwardly forecloses any argument that Plaintiff has standing in this case.  According to Defendants, the Original Appalachian court "specifically rejected that an exclusive agency agreement provides standing to sue" and instead determined that a grant "of the right to act as an 'exclusive agent' for a copyright owner in authorizing *others* to use a copyrighted work is a mere *contractual* right, not a *copyright* enforceable under the Copyright Act."  [Doc. 31-1, p. 14].

Plaintiff, on the other hand, asserts that Original Appalachian is "radically different" because the plaintiff in that case "did not have an agreement that explicitly and conclusively conveyed rights under [§] 106 of the Copyright Act." [Doc. 37-2, p. 5].  It is true that in Original Appalachian, SN & C did not tie their standing argument to a *specific* § 106 right; instead, SN & C contended that "the expansive language describing the [§] 106 rights" was broad enough to encompass SN & C's "exclusive right to authorize others to use OAA's copyright."  Original Appalachian, 679 F. Supp. at 1572.  By contrast, Plaintiff in this case claims that the Agreement is "a clear, explicit and exclusive grant of [§] 106 rights" in the Afanador Work, "including an exclusive license" to distribute, license, market and syndicate the photograph.  [Doc. 37-2, p. 6].  However, the Court disagrees with the threshold premise that the plain language of the Agreement "explicitly and conclusively" conveys to Plaintiff any § 106 rights.  The Agreement "explicitly and conclusively" makes Plaintiff Afanador's agent but its terms do not otherwise expressly convey to Plaintiff an exclusive license to any of the § 106 rights.  Other than reciting the text of the Agreement and asserting that the language confers § 106 rights, Plaintiff simply has not provided this Court with legal authority or other argument to interpret this language in any other manner.

Moreover, Original Appalachian does not support Plaintiff's interpretation of the Agreement.  For example, in that case, SN & C held the exclusive right to authorize third parties to prepare and reproduce materials in literary form based on OAA's designs, yet this "exclusive worldwide right[]" to license OAA's designs was not enough to establish standing.  679 F. Supp. at 1568.  Here, Plaintiff merely holds a role as Afanador's exclusive agent, pursuant to which Plaintiff may distribute Afanador's works.  Plaintiff has not persuaded this Court that Original Appalachian's rationale should not apply to this case.[9]  In other words, Plaintiff has not explained why the Agreement renders Plaintiff an exclusive licensee, when, on its face, it appears to do no more than render Plaintiff an exclusive agent.  The Court is inclined to find that Plaintiff's claims, if any, arise under the Agreement rather than under the Copyright Act.

Courts outside this circuit have agreed with the holding of Original Appalachian that an agency agreement confers rights that sound in contract rather than copyright.  For example, in Plunket v. Doyle, the plaintiff claimed to be the exclusive manager and licensor of the literary rights to the works of Sir Arthur

---

[9] Of course, Original Appalachian, as a district court decision, is not binding.  However, this Court considers it to be particularly persuasive authority.  See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) ("Although a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

Conan Doyle.  No. 99 CIV 11006, 2001 WL 175252, at *1 (S.D.N.Y. Feb. 22, 2001).  The plaintiff alleged that she held the "exclusive worldwide rights to manage" and to "negotiate, license, and otherwise cause and permit the exploitation of" all rights associated with these works of literature.  Id.  The plaintiff sued the estate of Sir Arthur Conan Doyle for copyright infringement.  Id.  The court held that the plaintiff's "exclusive management rights . . . do not give her standing to sue for copyright infringement under the Copyright Act."  Id. at *5.  Part of the court's reasoning was the plaintiff's pleading deficiency; she failed to allege that she was either an owner or an exclusive licensee of the literary works at issue.  Id.  The other part, though, was the court's unwillingness "to find a new cause of action under § 501(b) for acts that sound more in tortious interference with contract than in infringement of rights arising under copyright law."  Id.  This Court is similarly hesitant to find a new cause of action under the Copyright Act.

In another case, a stock photography agency, Viesti, sued an educational publisher, McGraw-Hill, for copyright infringement, alleging that McGraw-Hill exceeded the scope of a licensing agreement by publishing certain stock photographs.  Viesti Assocs., Inc. v. McGraw-Hill Glob. Educ. Holdings, LLC, No. 12-cv-00668, 2015 WL 585806, at *1 (D. Colo. Feb. 11, 2015).  The photographers of those images entered into agency agreements with Viesti in

which they appointed Viesti as their "non-exclusive agent and representative in respect of the leasing and sale of said materials throughout the world." Id. at *2.  It appears that other photographers, though, entered into similar agency agreements appointing Viesti as their "exclusive agent and representative." Id. at *6.  McGraw-Hill sought summary judgment on the grounds that Viesti lacked an exclusive copyright interest in the photographs at issue and therefore lacked standing to sue.  Id. at *3.

The court agreed with McGraw-Hill, determining that the agency agreements "did not transfer to Viesti legal or beneficial ownership of an exclusive right." [10]  Id. at *6.  The court also concluded that the agency agreements "fail[ed]

---

[10] This analysis was in the context of a collateral estoppel argument.  Viesti Associates was the third in a series of cases brought by Viesti against educational publishers.  2015 WL 585806, at *1.  In the prior cases, the court had considered and rejected Viesti's arguments for standing.  Id. at *5.  More specifically, in an earlier case, the court examined the language of similar agency agreements and determined that "the plain meaning of the agreements does not purport to convey to Viesti any ownership interest in a copyright.  Rather, the agreements' first paragraph contains the only reference to ownership and clearly states that sole and exclusive ownership in the images is vested in the photographer." Viesti Assocs., Inc. v. Pearson Educ., Inc., No. 11-CV-01687, 2014 WL 1053772, at *12 (D. Colo. Mar. 19, 2014).  The Agreement in this case similarly references copyright ownership in the Afanador Work only to clarify that Afanador himself "must be the sole owner of the copyright for all such photographs." [Doc. 29-6, p. 2].  In Pearson, Viesti did not argue that the agency agreements constituted exclusive licenses, but the court nonetheless found "no basis upon which to conclude that the Agency Agreements convey to Viesti an exclusive license to the Pearson Photographs." 2014 WL 1053772, at *12 n.19.  In Viesti Associates, then, McGraw-Hill argued that Viesti was collaterally estopped from raising these same contentions about standing.  The court determined that collateral estoppel "bar[red] the majority of Viesti's standing

to transfer any exclusive licenses" and did not distinguish between the agreements with "exclusive" and "nonexclusive" language in reaching this conclusion.  <u>Id.</u> Moreover, the court reasoned, "nothing in the[] agreements . . . restricts the photographers from licensing the same images on their own behalf or prosecuting all other infringements," which meant that "Viesti ha[d] not demonstrated that it received an exclusive license."  <u>Id.</u>  The court thus concluded that the agency agreements conveyed to Viesti only a nonexclusive license, even though the court considered Viesti be an *exclusive* agent.

These cases lead the Court to the conclusion that Plaintiff lacks statutory standing in this matter.  At the outset, the plain language of the Agreement makes Plaintiff Afanador's exclusive agent, not his exclusive licensee.  <u>Original Appalachian</u>, the only case in this circuit to address a similar issue, reasoned that a licensing agent did not have standing to sue because its rights derive from the licensing contract rather than from the Copyright Act.  Plaintiff has not meaningfully distinguished <u>Original Appalachian</u>, and cases such as <u>Plunket</u> and <u>Viesti Associates</u> further confirm the principle that an agency agreement alone does not establish statutory standing for copyright infringement.

---

arguments" and that, where it did not, McGraw-Hill was nonetheless entitled to summary judgment on the standing issue.  2015 WL 585806, at *7.

Plaintiff directs this Court to <u>Minden Pictures, Inc. v. John Wiley & Sons,</u>

<u>Inc.</u>, a case in which the Ninth Circuit Court of Appeals found that a stock

photography agency had standing to sue under the Copyright Act on the basis of

agency agreements with individual photographers.  795 F.3d 997 (9th Cir. 2015).

<u>Minden</u>, however, does not change the outcome of the present case.  There,

individual photographers signed agency agreements that appointed Minden, a stock

photography agency, as their "'sole and exclusive agent and representative with

respect to the Licensing of any and all uses of Images.'"  <u>Id.</u> at 1000.  The

agreements also "confer[red] upon Minden 'the unrestricted, exclusive right to

distribute, License, and / or exploit the Images . . . without seeking special

permission to do so.'"  <u>Id.</u> (second alteration in original).  Minden granted licenses

to an educational publisher, John Wiley & Sons ("Wiley"), and later sued Wiley

for infringement, alleging that it exceeded the scope of the licenses.  <u>Id.</u>

The district court dismissed the case for lack of standing because "[i]n the

court's view, the fact that Minden was authorized, as the exclusive licensing agent

for the photographers, to issue licenses to use the copyrighted photographs did not

give it a sufficient property interest in the photographs to bring an infringement

suit." <u>Id.</u> at 1001.  The Ninth Circuit reversed on appeal, concluding that the

agency agreements conveyed to Minden a sufficient interest for statutory standing

purposes.  Id. at 1003.  According to the court, the agreements "explicitly permit[ted] Minden to reproduce, and to authorize the reproduction of, the copyrighted photographs" and granted Minden the right "'to authorize' both the distribution and the display of the photographs by granting licenses to third parties such as Wiley."  Id.  Reproducing the copyrighted work and authorizing the display and distribution of the work, as the court noted, are exclusive rights under § 106.  Id.  The Ninth Circuit then determined that Minden held an exclusive license under the agency agreements, which provided it with a sufficient ownership interest to bring a suit for copyright infringement.  Id. at 1005.

Minden suggests that an agency agreement can constitute an exclusive license and thus provide standing to sue.  However, Minden is distinguishable. The agency agreements in that case contained clear language indicating that they transferred to Minden an exclusive right (rather than merely appointed Minden as an exclusive agent):  "The [a]greements also confer upon Minden 'the unrestricted, exclusive right to distribute, License, and / or exploit the Images . . . without seeking special permission to do so.'"  Id. at 1000 (second alteration in original). The Agreement in this case lacks any such language.  In Minden, too, it seemed fairly clear that the agency agreements constituted some kind of license; the analysis hinged on whether that license was exclusive or nonexclusive.  Id. at

1004.  Here, though, while the Agreement certainly makes Plaintiff an exclusive *agent* to perform for Afanador certain functions, the Court does not agree with Plaintiff that the Agreement, on its face, constitutes an exclusive license.  Finally, the Court is also more inclined to find authority from this circuit, like <u>Original Appalachian</u>, persuasive than a case from another circuit altogether.

Importantly, there is another hurdle for Plaintiffs to clear before establishing statutory standing.  Even if the Agreement conveyed to Plaintiff an exclusive license, the Agreement contains no language suggesting that it confers to Plaintiff the § 106 right that is at issue in this case:  the exclusive right to authorize the preparation of derivative works based upon the copyrighted work.  <u>See</u> 17 U.S.C. § 106(2).  The First Amended Complaint, for instances, refers to the Torres Works as "derivative work[s]" and "derivative version[s]" of the Afanador Work.  <u>See, e.g.</u>, [Doc. 29-1, p. 4].  The very language of § 501(b) suggests that the owner of an exclusive right may only "institute an action for any infringement of *that particular right* committed while he or she is the owner of it."  17 U.S.C. § 501(b).  It stands to reason that Plaintiff cannot sue for infringement of the right to prepare derivative works if Plaintiff does not hold that particular right in the first instance.  Other courts have found that plaintiffs failed to demonstrate standing where they lacked an exclusive right to the specific right at issue in the case.  <u>See</u> <u>Roberts v.</u>

Gordy, 359 F. Supp. 3d 1231, 1240–41 (S.D. Fla. 2019) (finding that the plaintiffs failed to establish standing where they relied on their rights to performance and royalties but the right at issue in the case was the right to prepare derivative works); Fahmy v. Jay-Z, 908 F.3d 383, 394 (9th Cir. 2018) ("Because Fahmy is not the beneficial owner of the right that Fahmy alleges Jay-Z infringed—the right codified in § 106(2) related to preparation of derivative works—Fahmy lacks standing to sue for infringement of that right.").  Although Plaintiff asserts in the First Amended Complaint that it holds an exclusive right to prepare derivative works, this is a legal conclusion that the Court need not accept as true.  Franklin v. Curry, 738 F.3d 1246, 1248 n.1 (11th Cir. 2013) ("[W]e afford no presumption of truth to legal conclusions . . . .")  In any case, the Agreement clearly shows to the contrary.  Thus, even if Plaintiff held an exclusive license under the Agreement, it does not appear that Plaintiff holds an exclusive license to the right—the preparation of derivative works—that it alleges Defendants infringed.

For the reasons set forth above, the Court believes that Plaintiff lacks standing under the Copyright Act to bring this action.  In the response to the Motion to Dismiss, Plaintiff requested leave to amend if this Court determined, upon examination of the Agreement, that Plaintiff lacked an exclusive § 106 right. The Court is reluctant to do so; Plaintiff has already had an opportunity to amend

the complaint.  Nevertheless, in an abundance of caution, the Court will permit

Plaintiff an opportunity to amend, as detailed at the conclusion of this Order.

## B.    Fair Use

Defendants assert that Plaintiff failed to state a claim for copyright

infringement because the Torres Works constitute fair use.  "Fair use is a defense

that can excuse what would otherwise be an infringing use of copyrighted

material."  Cambridge Univ. Press v. Patton, 769 F.3d 1232, 1238 (11th Cir. 2014).

Importantly, though, fair use "is an affirmative defense and should be pleaded as

such."  Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1239 (11th Cir. 2010).  It is

the unusual case that a court considers fair use on a motion to dismiss, let alone

grants a motion on that basis.  See McGucken v. Newsweek LLC, 464 F. Supp. 3d

594, 604 (S.D.N.Y. 2020) (observing "'a dearth of cases'" dismissing infringement

claims based on a defense of fair use (quoting BWP Media USA, Inc. v. Gossip

Cop Media, LLC, 87 F. Supp. 3d 499, 505 (S.D.N.Y. 2015))).  Because fair use

requires a case-by-case and fact-intensive analysis, "[i]t is easy to see why a fair

use defense typically cannot be analyzed upon a Rule 12(b)(6) motion."  Katz v.

Chevaldina, 900 F. Supp. 2d 1314, 1315 (S.D. Fla. 2012).  Accordingly, the Court

considers it improper to analyze the affirmative defense of fair use on a motion to

dismiss and declines to address this issue at this point in the litigation.

**CONCLUSION**

For the reasons set forth above, the Motion to Dismiss [Doc. 31] is

**GRANTED**.  The case is **DISMISSED WITHOUT PREJUDICE**.  The Motion

to Disregard Plaintiff's Improper Response Brief [Doc. 35] is **GRANTED**.  The

Motion for Joinder [Doc. 39] [Doc. 41] is **GRANTED**.

The Court will afford Plaintiff the opportunity to amend the complaint

within fourteen days of the date of this Order.  Plaintiff is notified that the failure

to submit an amended complaint within the fourteen-day time period will result in

dismissal of the entire action with prejudice.  Plaintiff is reminded of the obligation

to comply with the Local Rules of this Court in all filings.  The Clerk is

**DIRECTED** to resubmit this matter in the event that an amended complaint is not

filed.

**SO ORDERED** this 13th day of March, 2023.

J. P. BOULEE
United States District Judge